[No. B074848. Second Dist., Div. Two., Apr. 16, 1996.]

EILEEN A. RODDENBERRY, Plaintiff and Appellant, v.
MAJEL RODDENBERRY, as Executor, etc., et al., Defendants and
Appellants.

## COUNSEL

Greenberg, Glusker, Fields, Claman & Machtinger, Michael A. Greene, Brian Edwards, Greines, Martin Stein & Richland, Kent L. Richland and Barbara W. Ravitz for Defendants and Appellants.

Jones, Day, Reavis & Pogue, Elwood Lui, Thomas M. McMahon and Laura A. Matz for Plaintiff and Appellant.

## OPINION

ZEBROWSKI, J.—The meaning of a term used in a contract is sometimes so obvious to the contracting parties that neither side sees any need for an express definition. Later, after circumstances have changed and new financial incentives have arisen, one side may wish it had a different agreement. Remanufactured memories and new advice then combine to ascribe an updated and previously uncontemplated meaning to the term. This is such a case.

The plaintiff is Eileen A. Roddenberry (the first Mrs. Roddenberry). Until his death shortly before trial, the primary defendant was her former husband, Gene Roddenberry. Gene Roddenberry created the *Star Trek* television series, movies, animations, and other Star Trek properties. Majel Roddenberry (the second Mrs. Roddenberry) is now a defendant in her capacity as an executor of Gene Roddenberry's estate. Gene Roddenberry's loan-out corporation "Norway" is also a defendant.

The case presents two issues. A rough summary of the first issue is whether certain profits generated by Star Trek projects created after Gene Roddenberry and the first Mrs. Roddenberry divorced (while Gene Roddenberry was married to the second Mrs. Roddenberry) belong to the second Mrs. Roddenberry and Gene Roddenberry's estate, or to the first Mrs. Roddenberry. The second issue is whether punitive damages for fraud were properly awarded against Norway after Gene Roddenberry's death.

### FACTUAL SUMMARY

*The original Star Trek television series.*

In the 1960's, during his marriage to the first Mrs. Roddenberry, Gene Roddenberry developed a television series entitled *Star Trek*. *Star Trek* (hereafter Star Trek 1) appeared on NBC for three seasons, from 1966 to 1969.

By the time Gene Roddenberry and the first Mrs. Roddenberry divorced in 1969, Star Trek 1 had rated third in its time slot for each of its three seasons, had amassed a multimillion-dollar production deficit, was considered a commercial failure, and had been cancelled by NBC. Efforts were underway to syndicate Star Trek 1 for rerun on local television stations. Norway's contract with the Star Trek 1 production company provided that Norway was entitled to several types of income from syndications, including a set payment per rerun and "profit participation" payments if reruns ever yielded profits according to the contractual formula.[1]

*The divorce settlement agreement and judgment.*

In mid-1969, Gene Roddenberry and the first Mrs. Roddenberry agreed to a divorce settlement covering the typical numerous issues and resulting from the typical numerous trade-offs. Among the many community assets distributed was Norway, which held the rerun payment and profit participation rights in "Star Trek." Norway also owned a copyright interest in Star Trek.[2] The settlement agreement allocated Norway to Gene Roddenberry; the first Mrs. Roddenberry received other marital property. The settlement agreement thus allocated to Gene Roddenberry all the previous community property rights in Star Trek, including the marital copyright interests, with only one exception: The first Mrs. Roddenberry was allocated a "one-half interest in all future profit participation income from 'Star Trek' to which [the first Mrs. Roddenberry] and/or [Gene Roddenberry] are entitled."[3]

The agreement was handwritten (mostly by the first Mrs. Roddenberry's attorney), read into the court record (by the first Mrs. Roddenberry's attorney), and entered as a judgment in 1969. The judgment provided that subject to its provisions, "all future income of each party is that party's separate property." Thus except for whatever was included in the category of "profit participation income from Star Trek," the first Mrs. Roddenberry had bargained away all property interests she might have had in Gene Roddenberry's postdivorce income.[4]

---

[1]In Norway's contract with the Star Trek 1 production company, the term "profit participation" captioned a section defining Norway's rights to profits from syndications. The contract provided that Star Trek 1 had to repay a large and growing production cost deficit before any syndication profits would be payable to Norway.

[2]Norway shared the copyrights with the Star Trek 1 production company, Desilu. Desilu's interest was later transferred to Paramount.

[3]It was actually Norway that was entitled to "profit participation" income from "Star Trek." However, the parties often referred to Norway and Gene Roddenberry interchangeably.

[4]She was entitled to, and for many years received, alimony. The issue here is whether she retained a property interest in his postdivorce income, as opposed to a family law right to alimony.

The terms "profit participation" and "Star Trek" used in the 1969 settlement agreement and resulting judgment were not expressly defined. The current dispute was possible because of this lack of express definition.

*Postdivorce Star Trek projects.*

After these events, Gene Roddenberry devoted the remaining 21 years of his life to various Star Trek projects. He married the second Mrs. Roddenberry within days of his divorce and remained married to her until his death in 1991. The second Mrs. Roddenberry assisted in his postdivorce Star Trek efforts.

These postdivorce efforts gradually bore fruit. From 1973 to 1975, a Star Trek animation series was broadcast on NBC. It won an Emmy and was rerun in syndication. In 1979, STAR TREK: THE MOTION PICTURE (Paramount Pictures) was released. Five sequels followed. A new Star Trek television series, *Star Trek: The Next Generation* (hereafter Star Trek 2) appeared in 1987. Additional projects included television specials, merchandising, music, etc. In January 1993, after Gene Roddenberry's death, a spin-off television series entitled *Star Trek: Deep Space Nine* (hereafter Star Trek 3) began.

*Star Trek 1 goes into profits, suit is filed.*

By 1984, 15 years after its cancellation as a financial failure, Star Trek 1 had recouped its production deficit, and Norway began to receive "profit participation" payments. Norway began making payments to the first Mrs. Roddenberry.

Near the end of 1987, the first Mrs. Roddenberry filed suit claiming—correctly, it was later determined—to have been shorted. Initially, she claimed only half of Norway's profit participation in Star Trek 1. Later, she expanded her claim to half of all income from all of Gene Roddenberry's postdivorce Star Trek efforts.[5] She also sued Norway and Gene Roddenberry for fraud in connection with Norway's handling of payments to her.

### THE TRIAL COURT JUDGMENT

After trial in part to the court and in part to a jury, and subject to adjustments and qualifications not necessary to detail here, the trial court entered a multipart judgment.

---

[5]With minor exception: she did not claim half of Gene Roddenberry's fees for college and convention lectures. Otherwise she claimed half of all his Star Trek income.

*The Star Trek 1 "profit participation" interest.*

The trial court found that the first Mrs. Roddenberry was entitled to half the profit participation payments from Star Trek 1. Offsets claimed by Norway and the estate were disallowed. (This portion of the judgment has not been appealed, and would be affirmed in any event.)[6]

*The fraud claim.*

The trial court also entered judgment on a jury verdict against Norway for $900,000 in punitive damages for fraud in Norway's handling of profit participation payments to the first Mrs. Roddenberry.

*The postdivorce Star Trek projects.*

On the first Mrs. Roddenberry's claim to half of all income generated by Gene Roddenberry's postdivorce Star Trek projects, the trial court rendered a split and inconsistent decision.

Preliminarily, the trial court simply ignored the first Mrs. Roddenberry's testimony that she was entitled to half of all postdivorce Star Trek income. This testimony was contrary to the express language of the settlement agreement and resulting judgment, and was inconsistent with all other evidence. The trial court properly ignored it and focused on the issue of profit participation.

In evaluating the profit participation issue, the trial court identified six categories of Star Trek projects, five of which (all except Star Trek 1) postdated the 1969 divorce: (1) Star Trek 1, (2) the Star Trek animations in 1973 through 1975, (3) the six motion pictures from 1979 to 1991, (4) the Star Trek 2 television series beginning in 1987, (5) the Star Trek 3 television series beginning in 1993, and (6) various merchandising ventures on an ongoing basis.

With regard to the postdivorce projects designated as (2) the Star Trek animations, (3) the six Star Trek movies, and (6) the merchandising ventures, the trial court employed a traditional contractual intent analysis. Based on this analysis, the trial court found no contractual intent that the first Mrs. Roddenberry would receive any profits generated by these postdivorce projects. As to animations, movies and merchandising, judgment was therefore for defendants.

---

[6]According to the first Mrs. Roddenberry's brief filed in March of 1995, "[t]hus far, she has received only *$13.8 million*." (Italics in original.) She continues to receive disbursements every six months.

With regard to Star Trek 2 and 3, the trial court employed a markedly different analysis. Instead of applying the same traditional contractual intent analysis which resulted in a defense verdict on animations, movies and merchandising, the court instead inquired whether Star Trek 2 and 3 were "continuations" of Star Trek 1. Finding that both Star Trek 2 and 3 were "continuations" of Star Trek 1, the trial court awarded the first Mrs. Roddenberry half the profits from Star Trek 2 and 3.[7]

## THIS APPEAL

The first Mrs. Roddenberry appeals the ruling that she is not entitled to profits from the animations, movies, and merchandising, on the grounds that this ruling is not supported by substantial evidence.

Norway and the estate appeal the award of half the Star Trek 2 and 3 profits to the first Mrs. Roddenberry on the grounds that this award is not supported by substantial evidence. Norway also appeals the punitive damage award on several grounds.

## DISPOSITION ON APPEAL

That part of the judgment which denies the first Mrs. Roddenberry profits from the postdivorce animations, movies and merchandising is affirmed. That part of the judgment which awards the first Mrs. Roddenberry $900,000 in punitive damages against Norway for fraud is also affirmed. That part of the judgment which awards the first Mrs. Roddenberry profits from Star Trek 2 and 3 is reversed.

## THE EVIDENCE AND CONTENTIONS REGARDING CONTRACT INTERPRETATION

Phase I of the trial was a declaratory relief phase supposedly limited to determining the meaning of "profit participation income from Star Trek." Subsequent phases concerned accounting and damage issues and the fraud claim. The evidence and contentions relevant to the phase I contract interpretation issue are summarized next below. Phase I alone consumed 15 days

---

[7]The court later added that the first Mrs. Roddenberry was also entitled to half the profits from two Star Trek television specials and from any other Star Trek television programs that might be made in the future. The term "Star Trek 2 and 3" is used *post* to include the television specials and any future Star Trek television programs or series. The trial court also later ruled that the first Mrs. Roddenberry had no contract rights in any other postdivorce Star Trek projects that might be developed, including any exploitations by means of as-yet-undeveloped technologies. Reference *post* to the postdivorce Star Trek animations, movies, and merchandising includes any other forms of postdivorce exploitation.

and the record is hence voluminous. However, the evidence ranged far afield and is more notable for its bulk than its relevance. The irrelevant evidence and contentions are noted where necessary.[8]

*The contentions regarding the meaning of "profit participation income from Star Trek" in the settlement agreement and judgment.*

Norway and the estate contended first that the term "profit participation" as used in the settlement agreement referred to the "Profit Participation" section of Norway's contract with the Star Trek 1 production company. Second, they contended that the term "Star Trek" as used in the 1969 settlement agreement and judgment referred to the only "Star Trek" property then in existence, contemplated, or discussed during the settlement negotiations, Star Trek 1. The first Mrs. Roddenberry contended that the settlement agreement entitled her to half the profits from all Star Trek projects, including those developed by Gene Roddenberry postdivorce while he was married to the second Mrs. Roddenberry.[9]

In the abstract, the language in the settlement agreement is reasonably susceptible to either meaning. The trial court therefore correctly received parol evidence. (*Pacific Gas & E. Co.* v. *G. W. Thomas Drayage etc. Co.* (1968) 69 Cal.2d 33, 37 [69 Cal.Rptr. 561, 442 P.2d 641]; *Appleton* v. *Waessil* (1994) 27 Cal.App.4th 551, 554-555 [32 Cal.Rptr.2d 676]. See generally, Wegner et al., Cal. Practice Guide: Civil Trials and Evidence 2 (The Rutter Group 1995) ¶ 8:3102 et seq., and cases there cited.)

*Categories of phase I evidence.*

The phase I evidence fell roughly into three categories. The first and largest category was evidence regarding events long after the divorce: Gene Roddenberry's postdivorce Star Trek efforts, his postdivorce Star Trek contracts, Norway's fraudulent handling of Star Trek 1 profit participation payments, various entertainment industry accounting practices, etc. Most of this evidence had no relevance to the question of what the parties intended by the language used in their 1969 settlement agreement and judgment, and

[8]Current counsel on appeal were not counsel during the phase I contract interpretation trial. Current counsel thus had no opportunity to structure the issues or evidence, and this may account for the disconnection between the evidence presented at trial and the issues advanced by the first Mrs. Roddenberry on appeal.

[9]The first Mrs. Roddenberry actually testified that she was entitled to half of all of Gene Roddenberry's postdivorce Star Trek income of any kind, including wages or other payment for personal services, excluding only lectures.

it is unclear why much of this evidence was admitted in phase I.[10] (See *Cedars-Sinai Medical Center* v. *State Bd. of Equalization* (1984) 162 Cal.App.3d 1182, 1187 [208 Cal.Rptr. 837] [intention at time of contracting is paramount]; *Thomas* v. *Buttress & McClellan, Inc.* (1956) 141 Cal.App.2d 812, 816 [297 P.2d 768] [contractual intent is to be ascertained as of the time the contract was made; subsequent unforeseen events do not control determination of intent]; Civ. Code, § 1636 [contract must be interpreted to give effect to mutual intention of the parties as it existed at the time of contracting].)

The second largest category of evidence presented in phase I identified possible forms of exploitation of a story idea in the entertainment industry. This evidence defined the universe of meanings to which the term "Star Trek" is susceptible. Within the broadest conceivable universe was the meaning advanced by the first Mrs. Roddenberry: everything. ▇ It was because the term "Star Trek" was susceptible to so broad an interpretation, as well as to the more limited interpretation advanced by defendants, that parol evidence was properly received to determine the meaning actually intended by the parties.

Evidence identifying a range of possible meanings merely identifies possibilities. Such evidence is inherently incapable of proving which meaning was actually intended. If evidence is presented that one meaning was actually intended, the mere existence of a contrary linguistic possibility does not constitute substantial evidence supporting the contrary choice. A theoretical possibility is not the equivalent of substantial evidence.[11] Showing the theoretical possibility is merely a prerequisite to the admission of parol evidence. A theoretical meaning unsupported by evidence cannot be arbitrarily preferred over an alternative meaning which is supported simply because the theoretical meaning is within the abstract universe of linguistic possibility. Hence the determination of contractual intent depended upon the third category of evidence: evidence bearing directly on what the parties actually intended.

*The circumstances at the time of contract.*

At the time of contract in 1969, the only "Star Trek" property in existence was Star Trek 1. By the time it was cancelled shortly before the settlement

---

[10]Some of it may have been a preemptive strike against an expected waiver, estoppel or laches defense, in light of the perhaps 20 years that elapsed before the first Mrs. Roddenberry claimed half of Gene Roddenberry's postdivorce Star Trek income. Other portions may have been intended to rebut the expectable inference that her claims were not advanced earlier because her theories of entitlement had been conceived only shortly before trial. In either case, little of this voluminous evidence concerned the parties' 1969 intent. Those portions that were arguably relevant seem directed toward explaining the first Mrs. Roddenberry's delay.

[11]The law regarding substantial evidence, and its application in this case, is discussed more fully below.

negotiations, it had amassed a production deficit of $3 million.[12] No further Star Trek projects were in development or contemplated.

*The negotiation of the settlement agreement.*

Gene Roddenberry would not agree to allow the first Mrs. Roddenberry to share in his postdivorce income except by way of alimony. The first Mrs. Roddenberry would not part with certain items of marital property. The negotiations therefore considered various scenarios, and one asset ultimately allocated to Gene Roddenberry was Norway. The first Mrs. Roddenberry received only the half-interest in profit participation from Star Trek.

In a handwritten proposal by the first Mrs. Roddenberry's attorney, Jerry Edelman, early in the negotiations, he proposed that the first Mrs. Roddenberry be allocated "any income directly or indirectly generated by 'STAR TREK', whether in the form of royalties, rerun fees, profit participation, or otherwise." Gene Roddenberry would not agree, and the allocation to the first Mrs. Roddenberry was limited by negotiation to the "profit participation" item only. Both sides had copies of Norway's contract with the Star Trek 1 production company in which "Profit Participation" was a specific category of revenue.

During their negotiations, the parties regularly defined the profit participation interest as a 30 percent interest. When Attorney Edelman read the parties' settlement agreement into the record, Mr. Edelman referred to the first Mrs. Roddenberry's share of the profit participation income from Star Trek as "one-half of 30 percent - 15 percent." Thirty percent was the figure both sides believed to be Norway's profit participation interest in Star Trek 1 syndications. Later, because of doubt about the precise percentage figure (which was subject to calculation because of competing interests) the 30 percent figure was not included in the judgment.[13]

The evidence thus showed, and the trial court found, that in their negotiations the parties specifically discussed only profit participation in Star Trek 1. There was no evidence that the parties discussed any postdivorce Star Trek project, or any Star Trek project other than Star Trek 1.

*The Edelman declaration.*

Except for the profit participation item, the first Mrs. Roddenberry had traded away all her marital interest in Star Trek income. Nevertheless, when

---

[12]The deficit eventually grew to $5 million.

[13]It was later calculated that after proper allowance for Star Trek star William Shatner's interest, Norway's actual share was 26⅔ percent.

Gene Roddenberry began receiving rerun payments in 1970, she contended that she was entitled to half. As part of her effort to extract half the rerun payments, she filed the declaration of her former attorney Edelman with the court in early 1970.

Mr. Edelman declared that he had personally "negotiated almost continuously" in the judge's chambers, the corridor, and the cafeteria of the courthouse for three days in 1969 with the representatives of Gene Roddenberry. Attorney Edelman declared that "[i]t was my intention, and the intention of [Gene Roddenberry's representatives] that [the first Mrs. Roddenberry] participate in one-half (1/2) of all of the income from Star Trek, *so long as that income was earned on account of services already performed as distinguished from income for services to be performed, in which [the first Mrs. Roddenberry] was not to participate*. It was my intention, and I am informed and believe the intention of [Gene Roddenberry's counsel and advisers] that the language we used in the Stipulation, which language was later incorporated in the Interlocutory Decree of Divorce, would accomplish an even division of income from Star Trek, *attributable to past services*." (Italics added.) Mr. Edelman therefore claimed that the first Mrs. Roddenberry was entitled to half the rerun payments. He declared that he had prepared his declaration at the request of new counsel and understood that it would be used in an effort to obtain a new trial.

The new trial motion was denied in early 1970. The minute order does not state reasons, but the settlement agreement was negotiated partly in the judge's chambers and presumably at least partly in the judge's presence. The evidence in this action shows that the first Mrs. Roddenberry had initially demanded an interest in rerun payments, but later had bargained away that item in the course of the settlement negotiations.

At trial, the first Mrs. Roddenberry was asked this about Mr. Edelman's 1970 declaration: "Is it your belief or contention that Mr. Edelman was being untruthful when he made this statement?" She answered: "Mr. Edelman was not untruthful." The evidence was thus uncontradicted that the first Mrs. Roddenberry had no contractual right to income generated by services performed after the divorce. Her case was thus dependent upon proving that the income share she claimed was generated by services performed before the divorce.

Mr. Edelman himself testified, but could recall nothing of significance regarding the events over 20 years before.

*The first Mrs. Roddenberry's testimony.*

The first Mrs. Roddenberry claimed to have been unaware of the Star Trek animations, movies, and merchandising until the litigation. The evidence

was strongly against her claim of unawareness, and the trial court found that she was aware of these developments as they occurred. Nevertheless, she did not claim a share of income from the postdivorce Star Trek projects until many years after the divorce, and then only as an addition to a lawsuit initially seeking only profits from Star Trek 1.

The first Mrs. Roddenberry testified that she was present in the courthouse during the entire three days in 1969 on which the settlement agreement was negotiated, but did not directly participate in the negotiations. Instead, the negotiations were conducted by attorney Edelman and Gene Roddenberry's advisers outside her immediate presence. She did not read the stipulation handwritten by Mr. Edelman before Mr. Edelman read it into the court record. She did not remember any of the terms and conditions which he read to the court. Her testimony demonstrated continuing unfamiliarity with the terms of the settlement agreement and resulting judgment.

She nevertheless claimed half of all of Gene Roddenberry's postdivorce Star Trek income, including income from postdivorce rendition of personal services (expressly excluded by the judgment), rerun royalties (the same argument rejected on the new trial motion in 1970), and all other Star Trek income of every kind.[14] It was the type of baseless demand that would cause all prudent observers to check for their wallet. Her testimony was more in the genre of wishful thinking than factual testimony based on personal knowledge. The trial court ignored or rejected most of her testimony.

*The uniqueness of Star Trek's resurgence.*

The evidence was uncontradicted that Star Trek's postdivorce resurgence was unprecedented in entertainment industry history. Never before had a financially failed television series enjoyed such subsequent popularity, attracted subsequent investment, and inspired subsequent ventures.

Even though the first Mrs. Roddenberry was unfamiliar with the terms of the settlement agreement, she claimed to have anticipated the postdivorce Star Trek projects and their unprecedented success, and to have intended to obtain an interest in them via the settlement agreement, with which she was unfamiliar.

*The judicial admissions.*

In the first Mrs. Roddenberry's first amended complaint filed in 1990 (only two years before trial), her claim to "profit participation" from "Star

---

[14]Excepting only college and convention lectures.

Trek" was defined as "all profits and income that might thereafter be generated from Gene [Roddenberry's] and [the first Mrs. Roddenberry's] community property interest in 'Star Trek' *as it existed under the Contracts at the time of the Judgment.*"[15] (Italics added.) The claims advanced at trial, by contrast, went far beyond a claim to an interest in Star Trek as it existed at the time of the divorce.[16]

The first amended complaint also contained 14 references to the first Mrs. Roddenberry's interest as a 15 percent profit participation interest, clear references to half of the 30 percent profit participation percentage the parties originally believed payable pursuant to Norway's contract with the Star Trek 1 production company. (Cf. *Magnolia Square Homeowners Assn.* v. *Safeco Ins. Co.* (1990) 221 Cal.App.3d 1049 [271 Cal.Rptr. 1] [a pleading constitutes an evidentiary admission, although it may be shown that the statements were mistaken].) For example, the pleading stated that the divorce judgment awarded the first Mrs. Roddenberry a "one-half (15%) interest in future profit participation income from 'Star Trek,'" and "15% of the 30% constituting one-half of the community property to which Plaintiff and Defendant were entitled at the time of the divorce decree." The 15 percent and 30 percent figures applied only to profit participation in Star Trek 1. The postdivorce Star Trek projects carried different profit-sharing provisions. Later, the first Mrs. Roddenberry moved to amend her complaint to delete the percentage references, claiming they were mistakes. The motion was denied. The case was nevertheless tried as if the pleading laid claim to half of all postdivorce profits.

CONTENTIONS ON APPEAL REGARDING PROFIT PARTICIPATION

Norway and the estate advance two contentions concerning the award of Star Trek 2 and 3 profits: First, they contend that the award is not supported by substantial evidence. Alternatively, they contend that the objective evidence regarding contractual intent is not in conflict, and that we must therefore conduct a de novo review on appeal. (See generally, 1 Witkin, Summary of Cal. Law (9th ed. 1987) Contracts, § 681, p. 615; *Mission Valley East, Inc.* v. *County of Kern* (1981) 120 Cal.App.3d 89, 99 [174

---

[15]The original complaint, filed in 1987 by different counsel, contained an essentially identical definition of the first Mrs. Roddenberry's profit participation interest.

[16]At trial, the first Mrs. Roddenberry was asked about a letter written on her behalf in 1982 by her son-in-law, Attorney Richard Compton. The letter stated that to her knowledge she received only half the Star Trek interest that she and Gene Roddenberry "owned at the time of the divorce." In her deposition, she was asked whether that statement was true. "Yes," she answered. At trial, her then current counsel advised the court that her answer had been changed to "no." However, the equivalent admission, set forth in the text, continued to exist in her pleadings.

Cal.Rptr. 300] [appellate court must independently determine the meaning of contractual language if the extrinsic evidence is not in conflict].) The first Mrs. Roddenberry contests the denial to her of profits from the animations, movies and merchandising, contending there is no substantial evidence to support this denial.

After reviewing the record for substantial evidence, we find ample evidence to support the denial of animation, movie and merchandising profits to the first Mrs. Roddenberry. We find no substantial evidence to support the award of half the Star Trek 2 and 3 profits to the first Mrs. Roddenberry. We therefore need not consider the law regarding the nature of evidence permitting or requiring de novo review on appeal.

## THE SUBSTANTIAL EVIDENCE TEST

*The verbal formulation.*

■ ". . . [W]here extrinsic evidence has been properly admitted as an aid to the interpretation of a contract and the evidence conflicts, a reasonable construction of the agreement by the trial court which is supported by substantial evidence will be upheld." (*In re Marriage of Fonstein* (1976) 17 Cal.3d 738, 746-747 [131 Cal.Rptr. 873, 552 P.2d 1169].) "Substantial evidence" is evidence of ponderable legal significance, evidence that is reasonable, credible and of solid value. (*Kuhn* v. *Department of General Services* (1994) 22 Cal.App.4th 1627, 1633 [29 Cal.Rptr.2d 191], quoting *Estate of Teed* (1952) 112 Cal.App.2d 638, 644 [247 P.2d 54].) "Substantial evidence . . . is not synonymous with 'any' evidence." Instead, it is " ' "substantial" proof of the essentials which the law requires.' " (*Toyota Motor Sales U.S.A., Inc.* v. *Superior Court* (1990) 220 Cal.App.3d 864, 871-872 [269 Cal.Rptr. 647]; *Kruse* v. *Bank of America* (1988) 202 Cal.App.3d 38, 51 [248 Cal.Rptr. 217].) The focus is on the quality, rather than the quantity, of the evidence. "Very little solid evidence may be 'substantial,' while a lot of extremely weak evidence might be 'insubstantial.' " (*Toyota Motor Sales U.S.A., Inc.* v. *Superior Court, supra,* 220 Cal.App.3d 864, 871-872.) Inferences may constitute substantial evidence, but they must be the product of logic and reason. Speculation or conjecture alone is not substantial evidence. (*Louis & Diederich, Inc.* v. *Cambridge European Imports, Inc.* (1987) 189 Cal.App.3d 1574, 1584-1585 [234 Cal.Rptr. 889]; *Marshall* v. *Parkes* (1960) 181 Cal.App.2d 650, 655 [5 Cal.Rptr. 657].) Expert opinion testimony constitutes substantial evidence only if based on conclusions or assumptions supported by evidence in the record. Opinion testimony which is conjectural or speculative "cannot rise to the dignity of substantial evidence." (*Pacific Gas & Electric Co.* v. *Zuckerman* (1987) 189 Cal.App.3d 1113, 1135 [234 Cal.Rptr. 630].)

The ultimate test is whether it is reasonable for a trier of fact to make the ruling in question in light of the whole record. (*Kuhn* v. *Department of General Services, supra,* 22 Cal. App. 4th 1627, 1633.) "A formulation of the substantial evidence rule which stresses the importance of isolated evidence supporting the judgment, . . . risks misleading the court into abdicating its duty to appraise the whole record. As Chief Justice Traynor explained, the 'seemingly sensible' substantial evidence rule may be distorted in this fashion, to take 'some strange twists.' 'Occasionally' he observes, 'an appellate court affirms the trier of fact on isolated evidence torn from the context of the whole record. Such a court leaps from an acceptable premise, that a trier of fact could reasonably [have believed] the isolated evidence, to the dubious conclusion that the trier of fact reasonably rejected everything that controverted the isolated evidence. Had the appellate court examined the whole record, it might have found that a reasonable trier of fact could not have made the finding in issue. One of the very purposes of review is to uncover just such irrational findings and thus preclude the risk of affirming a finding that should be disaffirmed as a matter of law.' (Traynor, The Riddle of Harmless Error (1969) p. 27.) (Fns. omitted.)" (*People* v. *Johnson* (1980) 26 Cal.3d 557, 577-578 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255].)

██ Substantial evidence is therefore not merely an appellate incantation designed to conjure up an affirmance. To the contrary, it is essential to the integrity of the judicial process that a judgment be supported by evidence that is at least substantial. An appellate court need not "blindly seize any evidence . . . in order to affirm the judgment. The Court of Appeal 'was not created . . . merely to echo the determinations of the trial court. A decision supported by a mere scintilla of evidence need not be affirmed on review.' " (*Kuhn* v. *Department of General Services, supra,* 22 Cal.App.4th 1627, 1633 quoting in part *Bowman* v. *Board of Pension Commissioners* (1984) 155 Cal.App.3d 937, 944 [202 Cal.Rptr. 505].)

*The substantial evidence test as applied in case law.*

The verbal formulation set forth above provides general guidance. Cases applying the test provide additional guideposts to proper application. In the summary judgment context, for example, a declaration which simply contradicts a prior discovery admission is not normally acceptable as substantial evidence. (*D'Amico* v. *Board of Medical Examiners* (1974) 11 Cal.3d 1, 21-22 [112 Cal.Rptr. 786, 520 P.2d 10].) This is because "admissions against interest have a very high credibility value" and are "entitled to and should receive a kind of deference not normally accorded evidentiary allegations in affidavits." (*D'Amico,* at p. 22; see also *Thompson* v. *Williams* (1989) 211

Cal.App.3d 566, 573-574 [259 Cal.Rptr. 518] ["[a]fter-the-fact attempts to reverse prior admissions are impermissible because a party cannot rely on contradictions in his own testimony to create a triable issue of fact. [Citations.] The assertion of facts contrary to prior testimony does not constitute ' "substantial evidence of the existence of a triable issue of fact." ' "].) Numerous other cases have followed *D'Amico*'s lead. (See, e.g., *Roth* v. *Rhodes* (1994) 25 Cal.App.4th 530, 545 [30 Cal.Rptr.2d 706]; *Visueta* v. *General Motors Corp.* (1991) 234 Cal.App.3d 1609, 1613 [286 Cal.Rptr. 402]; *Rivera* v. *Southern Pacific Transportation Co.* (1990) 217 Cal.App.3d 294, 299 [266 Cal.Rptr. 11]; *Nunez* v. *R'Bibo* (1989) 211 Cal.App.3d 559, 563 [260 Cal.Rptr. 1]; *Leasman* v. *Beech Aircraft Corp.* (1975) 48 Cal.App.3d 376, 382 [121 Cal.Rptr. 768].)

*Niederer* v. *Ferreira* (1987) 189 Cal.App.3d 1485, 1503 [234 Cal.Rptr. 779], provides a variation and an escape valve. In *Niederer*, plaintiff testified at deposition that she had not been assigned a promissory note. The true fact was that she had been assigned the note. Later, in moving for summary judgment, plaintiff filed a declaration contradicting her deposition testimony and explaining that she had not understood the concept of assignment at the time of deposition, and hence had answered incorrectly. The evidence was otherwise clear that the note had in fact been assigned to her. The defendant opposed summary judgment, contending that plaintiff's prior contrary testimony established a triable issue of fact. After noting the holdings of *D'Amico* and *Leasman* that " 'the credibility of admissions [is] valued so highly that the controverting affidavits may be disregarded as irrelevant, inadmissible or evasive,' " the *Niederer* court noted that the reasons for the conflict were explained in plaintiff's declaration. (*Id.*, at p. 1503.] The court accepted the explanation, disregarded the prior conflicting testimony, and affirmed the summary judgment. Thus in *Niederer*, it was the second version of the facts—but a version accompanied by an innocent explanation—that was accepted as substantial evidence.

In the nonsuit context, the law is similar. In *Mikialian* v. *City of Los Angeles* (1978) 79 Cal.App.3d 150, 158, 161 [144 Cal.Rptr. 794], plaintiff tow truck driver sued the city, contending that the police breached a duty to place flares around his truck while he installed a dolly under a car to be towed. In his deposition, he testified that no one told him to park his truck at the location involved. At trial, however, he testified inconsistently—he testified that he had been told by police where to park and that he had decided where to park himself. He made no attempt to withdraw or explain the admissions in his deposition. The trial court granted a nonsuit. The Court of Appeal affirmed on the ground that the contradictory testimony was not substantial evidence, stating: "If plaintiff's testimony in this respect as given

in his deposition was in error, he had nine months prior to trial within which to correct it. Had he done so, he would have been called upon to explain the former testimony as a misreporting of his answers, a mistake on his part, or the product of a misunderstanding. Such an explanation would have created a fact issue. But plaintiff did not choose this course. He chose, instead, simply to make contradictory statements to the effect that he was directed where to park while continuing to make corroborative admissions that the decision was his own. Under these circumstances, we conclude that there was no substantial evidence that the officers directed plaintiff where to park." (*Mikialian* v. *City of Los Angeles*, *supra*, 79 Cal.App.3d 150, 160.)

Involved in the instant case is not prior deposition testimony, but rather a prior attorney declaration, representations to the court, admissions in pleadings, and a long history of conduct. ■ Whatever the nature of the evidence, truth is an ascendant value in litigation. Not every bald assertion rises to the dignity of substantial evidence. Transparent prevarication is not an acceptable basis for decision. In an appropriate context such evidence may even be rejected summarily without trial. In every context, the courts must be diligent not to base an award on testimony tailored by financial expediency rather than by truth. (See also *Kruse* v. *Bank of America*, *supra*, 202 Cal.App.3d 38, and *Louis & Diederich, Inc.* v. *Cambridge European Imports, Inc.*, *supra*, 189 Cal.App.3d 1574 for examples of cases examining evidence and finding it lacking in substance.)

### Substantial Evidence and the Burden of Proof

■ A correct application of the substantial evidence test in this case requires a clear understanding of the burden of proof, inasmuch as the first Mrs. Roddenberry consistently attempts to reverse it. Although the facts actually pleaded in the first Mrs. Roddenberry's operative complaint expressly refer only to the 15 percent profit participation interest in Star Trek 1, her case was tried as if the she had pleaded a contract interpretation reaching far beyond Star Trek 1. ■ Normally, a plaintiff seeking a contract recovery must plead the contract terms on which she relies for recovery. (4 Witkin, Cal. Procedure (3d ed. 1985) Pleading, § 469, p. 508.) Whatever plaintiff is obligated to plead, plaintiff is obligated to prove. (1 Witkin, Cal. Evidence (3d ed. 1986) Burden of Proof and Presumptions, § 131, p. 116 [basic rule is that a party must prove what the party must plead]; Evid. Code, § 500 [a party has the burden of proving all facts essential to the relief sought].)

■ Here, the first Mrs. Roddenberry relied on a contract interpretation which included all postdivorce Star Trek profits within the contractual

language "profit participation income from Star Trek." She should have clearly pleaded that claim. (*FPI Development Inc.* v. *Nakashima* (1991) 231 Cal.App.3d 367, 383 [282 Cal.Rptr. 508] [contract plaintiff must plead contract terms which establish the obligation in issue].) Although no pleading issue is raised on this appeal, examination of contract pleading requirements shows where the burden of proof falls. The first Mrs. Roddenberry's failure to plead clearly does not reduce her burden of proof. She bore the burden of proving that the contract was intended to allocate to her profits from postdivorce Star Trek projects.

Even though she bore the burden of proof, the first Mrs. Roddenberry argues on appeal that the Star Trek 2 and 3 profits award must be affirmed because there is no evidence of the negative: no evidence that the parties agreed *not* to pay her such profits. Her argument proceeds as if there were a presumption that she is entitled to all types of payments not expressly excluded. She emphasizes that during the settlement negotiations Star Trek 1 was considered a failure, and that there was no contemplation that Gene Roddenberry might further develop the Star Trek idea after divorce, as if this supported rather than refuted her claim. She argues that "nowhere in the Divorce Decree's preservation of [the first Mrs. Roddenberry's] interest in 'Star Trek' did the parties *exclude* television continuations of the Original Series. . . . Nor did any of the correspondence, the drafts of the Divorce Decree or the oral description of its terms in court *exclude* television continuations of the Original Series from the scope of the property to be divided." (Italics in original.) The failure to expressly exclude uncontemplated and nonexistent projects is immaterial. The burden was on the first Mrs. Roddenberry to establish that the money she now demands was included within her contractual rights.

The 1969 judgment clearly states that, subject to its terms regarding "profit participation income" in "Star Trek," all postdivorce income is separate property. This is consistent with normal community property law. The only way Gene Roddenberry could have breached the settlement agreement or judgment was if "profit participation income from Star Trek" in fact did include profits from postdivorce projects. In order to prove breach of the contract with respect to Star Trek 2 and 3, the first Mrs. Roddenberry had to prove that Star Trek 2 and 3 profits were *included* within the contractual language. A lack of evidence of *exclusion* does not satisfy her burden of proof.[17] An absence of evidence is not the equivalent of substantial evidence. (*Louis & Diederich, Inc.* v. *Cambridge European Imports, Inc.*, *supra*, 189 Cal.App.3d 1574, 1591.) If an absence of evidence could satisfy the burden of proof, the concept of burden of proof would have no meaning.

---

[17]Whether the record does or does not contain evidence of exclusion depends upon what one chooses to consider evidence of exclusion. The evidence is conclusive that the only Star

Resolution of the Star Trek 2 and 3 issue therefore depends on whether the record contains substantial evidence affirmatively supporting the proposition that Star Trek 2 and 3 profits were included in the 1969 contractual language.[18]

## THE SUBSTANTIAL EVIDENCE TEST AND THE ANIMATIONS, MOVIES AND MERCHANDISING

*The animations.*

■ In denying the first Mrs. Roddenberry postdivorce profits on the Star Trek animation series, the trial court's statement of decision noted that the first Mrs. Roddenberry's counsel, in stating the marital settlement for the court record, stated that the Star Trek interest referred to in the agreement was "50 percent of 30 percent—15 percent," and that this was the profit participation percentage thought attributable to Star Trek 1. A different profit percentage applied to the animation series, which was created postdivorce. The trial court also noted that "the only subject discussed in the courthouse was profit participation in the TV series, and that otherwise the transfer of all interest in Norway to Mr. Roddenberry was contemplated in those discussions." The court also relied on the history of the contract negotiations, in which the first Mrs. Roddenberry bargained away all but the profit participation item. The court finally noted that the first Mrs. Roddenberry had been aware of the cartoon series in the mid-1970's, yet made no claim to profits until years later. Additional evidence which could have been cited is that the marital settlement agreement left the copyright ownership in Norway, which became the separate property of Gene Roddenberry.

Against this evidence the first Mrs. Roddenberry essentially offered only her naked demand, inconsistent with both the settlement agreement and judgment, to half of all postdivorce Star Trek income. (See *Tahoe National Bank* v. *Phillips* (1971) 4 Cal.3d 11, 23 [92 Cal.Rptr. 704, 480 P.2d 320] [evidence inconsistent with any interpretation to which an instrument is susceptible is not substantial evidence]; *Golden West Baseball Co.* v. *City of Anaheim* (1994) 25 Cal.App.4th 11, 21, fn. 2 [31 Cal.Rptr.2d 378] [same; plus the bare semantic possibility that the term "Star Trek" in the settlement agreement could mean more than Star Trek 1.) The court's finding that she

Trek income item contemplated or conciously *included* was profit from Star Trek 1. It is true that the parties did not expressly exclude the nonexistent and uncontemplated.

[18]In another skillfull attempt to reverse the burden of proof, the first Mrs. Roddenberry cites *In re Marriage of Vomacka* (1984) 36 Cal.3d 459, 469 [204 Cal.Rptr. 568, 683 P.2d 248]. *Vomacka* involved spousal support, and the limited circumstances in which it may be waived. For many years, the first Mrs. Roddenberry received alimony. Alimony or spousal support is not an issue in this case.

had no contractual interest in the animation series was the only conclusion supported by substantial evidence in the record. The first Mrs. Roddenberry's testimony was, most charitably described, no more than testimony of undisclosed contractual intent. This is not substantial evidence. (See, e.g., 1 Witkin, Summary of Cal. Law, *supra*, Contracts, § 684, p. 617 [*expressed intent to be determined, objective standard to be applied*]; *Pacific Gas & Electric Co.* v. *Zuckerman*, *supra*, 189 Cal.App.3d 1113, 1141; *Mission Valley East, Inc.* v. *County of Kern*, *supra*, 120 Cal.App.3d 89, 98.)

*The movies.*

The trial court's denial of postdivorce profits on the movies was based on the same evidence discussed above plus the fact that the first Mrs. Roddenberry was well aware of the movies but made no claim to profits until many years later. The evidence was more than sufficiently substantial to support the ruling; there was no substantial evidence to support a contrary conclusion.

*Merchandising.*

In denying the first Mrs. Roddenberry postdivorce merchandising profits, the court noted the history of the contract negotiations plus the fact that the first Mrs. Roddenberry knew of the merchandising at the time of divorce, but did not make a claim to merchandising profits until years later. The relevant evidence was otherwise as noted above. The ruling was more than well supported; there was no substantial evidence to the contrary.

### THE SUBSTANTIAL EVIDENCE TEST AND STAR TREK 2 AND 3

*The lack of foundation for the "continuation" theory.*

■ The award of Star Trek 2 and 3 profits to the first Mrs. Roddenberry was not based on evidence of contractual intent, but rather on plaintiff's theory that Star Trek 2 and 3 are "continuations" of Star Trek 1. Depending upon what elements one might choose to include in a "continuation" theory and how they might be applied, it might be that the finding that Star Trek 2 and 3 are "continuations" of Star Trek 1 is supported by substantial evidence. However, this is merely an example of an old adage: "Ask the wrong question, and you will get the wrong answer."

Whether or not Star Trek 2 and 3 are "continuations" of Star Trek 1 is irrelevant. In order to be relevant, the "continuation" question would have to be the second step of a two-step analysis. The foundational step would be

proof of contractual intent that the first Mrs. Roddenberry receive profits from postdivorce "continuations" of Star Trek 1. The second step would be proof that Star Trek 2 and 3 are in fact "continuations" of Star Trek 1. The record here might arguably contain step 2, but it certainly does not contain step 1.[19]

*The "theatrical similarity" evidence.*

Instead of examining the evidence of contractual intent, the "continuation" analysis examined a completely different body of evidence—evidence of the characters, storylines, costuming, settings, technology, themes, etc., of Star Trek 1, 2 and 3. This body of "theatrical similarity" evidence might have been appropriate in a copyright infringement case. However, this was a contract interpretation case. In view of the lack of foundational proof of an agreement that the first Mrs. Roddenberry would receive profits from "continuations," the "theatrical similarity" evidence had no bearing on the issue of contract interpretation.

*The lack of established meaning of the term "continuation."*

There was no evidence that the "continuation" concept had any established meaning at the time of the negotiations in 1969. Evidence of this type, if it existed, might have been offered to prove that the concept of "continuation" was implicit in the parties' dealings. The evidence actually presented, however, was that it was unprecedented for a cancelled and financially unsuccessful television series to rise from commercial failure and to inspire further projects. So far as the record reveals, the "continuation" concept was developed only as a litigation tactic during this litigation, and had no connection to contractual intent in 1969.

*The inherent ambiguity in the "continuation" theory.*

When the trial detoured off the course of contractual intent analysis and onto the course of "continuation" analysis, it truly embarked on a mission to explore a strange new world. The inevitable destination was the land of error, because the contractual intent question remains unanswered regardless of how the "continuation" question is answered. Parties might agree that profits will be paid on postdivorce "continuations," or they might agree that

---

[19]Rather than pointing to evidence showing an agreement that the first Mrs. Roddenberry would receive profits from postdivorce "continuations," so that—contrary to normal community property law—she would share in the income from Gene Roddenberry's postdivorce efforts, the first Mrs. Roddenberry instead argues that she is entitled to these uncontemplated profits because the parties' agreement did not expressly exclude them. A failure to exclude the uncontemplated is not the equivalent of substantial evidence supporting inclusion.

profits will not be paid on postdivorce "continuations." They might even agree that profits will be paid on postdivorce projects whether they are "continuations" or not. Until the terms of the foundational agreement are proven, the case is not advanced toward resolution by determinations about "continuations."

*The inconsistencies created by the "continuation" analysis.*

The flaws in the "continuation" analysis are heralded by the inconsistencies this analysis created. It yielded a judgment not only inconsistent with the objective evidence and normal community property law, but also with gross internal inconsistencies. The traditional contractual intent analysis resulted in a defense verdict on animations, movies and merchandising. Tellingly, that verdict did not find that the first Mrs. Roddenberry had *waived* her contractual rights in animations, movies and merchandising, nor that she was *estopped, barred by laches* or *barred by the statute of limitations* from asserting them. Instead, the verdict was that she never had such contractual rights. This same contractual intent analysis was not even applied to Star Trek 2 and 3, even though there was no evidence that the settlement negotiations distinguished in this manner among various forms of possible exploitation.

Viewed from the reciprocal direction, the record also fails to disclose why the "continuation" analysis, if it properly applied to Star Trek 2 and 3, did not also apply to the movies to yield the same finding of "continuation." The movies are much more similar to Star Trek 1 than are Star Trek 2 and 3. Star Trek 2 used different actors and characters than Star Trek 1. The Star Trek 2 setting is on the same Starship Enterprise, but 78 years later. Star Trek 3 used different actors and characters and takes place at an even later time on a new and more advanced starship. Despite their differences from Star Trek 1, Star Trek 2 and 3 were found to satisfy the "continuation" test. By comparison, all six movies used the same actors, the same characters and the same setting as Star Trek 1. Despite these similarities, the movies were not even subjected to "continuation" analysis.

These anomalies cannot be reconciled on the theory that the parties agreed to split profits on all postdivorce television projects. There was no evidence the parties agreed upon or even discussed such distinctions among alternative or competing media. The first Mrs. Roddenberry did not testify to such a distinction and does not make such a distinction on appeal. Instead, she claims a contractual interpretation that entitles her to half of all profits, without regard to media. Moreover, the animations used the same characters and setting as Star Trek 1 and also appeared on television, yet were not even

subjected to "continuation" analysis. The only distinguishing characteristic here was animated rather than live action. A search for rational explanation thus inevitably leads to the supposition that the supposedly determinative distinction was a triple qualification: the first Mrs. Roddenberry was intended to receive profits from postdivorce projects so long as they were (1) "continuations," (2) on television, but (3) not animations. This proposition is of dubious parentage. There is absolutely no evidence that it was born of the parties' contract negotiations in 1969. At that time no further Star Trek projects of any kind were contemplated and there was consequently no discussion regarding different media or forms of presentation.

### The "literary property" argument.

On appeal, the first Mrs. Roddenberry raises a new argument in support of her claim to Star Trek 2 and 3 profits (as well as half of all other profits): she claims that she "retained" a profit participation interest in the generic "literary property" entitled Star Trek. While imaginative, this is merely another example of a semantical possibility unsupported by evidence. As discussed below, there was no evidence of "retention" by her of an interest in Norway's "literary property" or copyright. The theory also ignores the contrary avalanche of evidence in the record, and the trial court's finding, that the parties discussed only a division of profits from Star Trek 1, rather than some generic literary property concept. Additionally, it conflicts with the evidence that all copyright interests became the separate property of Gene Roddenberry through his ownership of Norway.

During the settlement negotiations, the first Mrs. Roddenberry proposed that an interest in Norway's Star Trek "royalties" be allocated to her, but she later bargained away that claim. The final agreement did not allocate any of Norway's Star Trek royalties to her. The term "royalties" normally refers to payments made for the use of copyrighted material. (*In re Marriage of Worth* (1987) 195 Cal.App.3d 768, 772, fn. 2 [241 Cal.Rptr. 135].) There was no evidence at trial of a different meaning that might apply in this context.

The first Mrs. Roddenberry nevertheless contends that she "retained" a right to be paid for exploitations of the Star Trek concept. While she does not appear to claim an actual copyright interest, it is clear that she claims the exact equivalent of a copyright interest. She cannot claim an actual copyright interest, because such an interest clearly could not have been "retained" by her, since she never owned a copyright interest in the first instance. Instead of a separate ownership interest in each of Norway's various assets, the first Mrs. Roddenberry simply owned a community property interest in Norway itself. Community property law does not give one spouse a continuing

postdivorce interest in property allocated to the other spouse in a divorce settlement. If Norway, for instance, owned a parcel of real estate, the first Mrs. Roddenberry would "retain" no residual interest in that real estate after Norway was transferred to her former husband. If she were to retain a residual half-interest in all property owned by Norway, by parity of reasoning Gene Roddenberry would retain a residual interest in all property allocated to her. A marital settlement agreement would have no meaning if this were the law.

Since she cannot claim an actual copyright interest after bargaining away all royalty claims and transferring Norway and its copyrights to Gene Roddenberry, the first Mrs. Roddenberry instead claims some form of noncopyright "literary property" entitlement to payment when Norway exploits the copyrights. The right she claims would place her in the position of an owner and licensor of a copyright interest, entitled to be paid by her putative licensee, Norway, upon Norway's receipt of profits from exploitation of the copyrighted material. But it is Norway that owns the copyright. Just as with the allocation of burden of proof, the first Mrs. Roddenberry again attempts to reverse the applicable legal rules, this time by not terming a copyright claim a copyright claim. Abraham Lincoln once said: "You can call a horse a cow if you want to, but it's still a horse." That applies here. The first Mrs. Roddenberry is clearly claiming a copyright interest she does not, and never did, own.

Although the first Mrs. Roddenberry shies away from directly terming her claim a copyright claim, she does note that "any of the exclusive rights that make up a copyright may be transferred in whole or in part to another," citing 17 United States Code section 201(d). This is correct under current copyright law. It is by no means clear, however, that this type of separation of copyright interests could have been effected by the actions taken in 1969 under the law that applied in 1969, when copyright interests were generally indivisible. (See, e.g., 3 Nimmer on Copyright (1995) § 10.01 ["The Doctrine of Indivisibility Under the 1909 Act"].) There was no proof offered at trial in support of the current theory that the copyright interests were divided in 1969 notwithstanding the indivisibility rule that then applied.[20]

Moreover, to the extent that current copyright law aids in interpretation of this 1969 transaction, current law requires a writing signed by the transferor

---

[20]Nimmer suggests techniques for achieving a de facto separation of copyright interests even under the indivisibility rule, primarily by use of licensing, but there is no evidence that the parties here utilized any such technique. Moreover, use of any of Nimmer's techniques in this situation would be quite unique. The effect would be that the copyright owner (Norway) has to pay for the use of its own copyright, rather than the more common situation in which the copyright owner is paid for allowing someone else to exploit some portion of the copyright interests. Nimmer does not discuss such a transaction, and it is difficult to conceive a situation in which one might want to achieve it.

to effect a copyright transfer. (17 U.S.C. § 204(a).) In the absence of a writing, it is the copyright owner who has the exclusive right to produce derivative works. (17 U.S.C. § 106(2); *Valente-Kritzer Video* v. *Pinckney* (9th Cir. 1989) 881 F.2d 772, 776.) As Judge Kozinski said in *Effects Associates, Inc.* v. *Cohen* (9th Cir. 1990) 908 F.2d 555, 556, "[t]he law couldn't be clearer: The copyright owner . . . has the exclusive rights to copy, distribute or display the copyrighted work publicly. [Citation.] While the copyright owner can sell or license his rights to someone else, section 204 of the Copyright Act invalidates a purported transfer of ownership unless it is in writing." (*Id.* at p. 556.)

A writing was also required under former law. "The statutory requirement of an instrument in writing, signed by the owner of the rights conveyed, was also contained in the 1909 Act." (3 Nimmer on Copyright, *supra*, § 10.03[A].) In the alternative, a transfer under the 1909 Act could be confirmed by a subsequent " 'note or memorandum of the transfer.' " (3 Nimmer on Copyright, *supra*, § 10.03[A].) No evidence was presented at trial that either a written conveyance or a subsequent confirmation of an earlier copyright transfer occurred in this case.

Regardless of what copyright law applies, it is clear that Norway owned the copyrights. Norway became the separate property of Gene Roddenberry. As owner of the copyrights, Norway had the exclusive right to exploit them. It is self-evident that an owner of property, such as a copyright, is not obligated to pay another for use of the property owned. The right to use owned property without compensating another is an integral part of the meaning of ownership. The first Mrs. Roddenberry is claiming a right to be paid for Norway's use of property which Norway owned, and in which the first Mrs. Roddenberry had no ownership interest.

*The "all profits are predivorce profits" argument.*

The first Mrs. Roddenberry also argues on appeal that all profits are attributable to predivorce work. This argument is apparently an effort to avoid the devastating effect of the Edelman declaration. The Edelman declaration established that the first Mrs. Roddenberry had no right to income generated by Gene Roddenberry's postdivorce efforts. (See, e.g. *Smith* v. *Walter E. Heller & Co.* (1978) 82 Cal.App.3d 259, 269 [147 Cal.Rptr. 1] [judicial admission by attorney is not merely evidence of a fact but rather a conclusive concession of truth which has the effect of removing that issue]; Wegner et al. Cal. Practice Guide: Civil Trials and Evidence 2, *supra*, ¶ 8:1252, p. 8D-55 [counsel's stipulations in open court normally conclusive on client and cannot be controverted].) Even assuming that the

first Mrs. Roddenberry could have repudiated Attorney Edelman's admission, she did not repudiate it. Instead, she agreed at trial that it was true (even as she brazenly demanded half of all postdivorce income in the same testimony).[21] On appeal, she now states that it "has always been her position" that she is not entitled to profits from "post-divorce services." She advances the remarkable contention, however, that *all* postdivorce profits are attributable to Gene Roddenberry's predivorce services.

The "all profits are pre-divorce profits" contention again ignores the uncontradicted evidence that the parties negotiated over division of profits from Star Trek 1 only. More significantly, however, it is simply inconsistent with the evidence. If it were true that all postdivorce profits were generated by predivorce work, it would tautologically follow that all postdivorce profits could have been realized without any postdivorce work by Gene Roddenberry. The evidence shows, to the contrary, extensive postdivorce work by Gene Roddenberry. Did this work contribute nothing to postdivorce profit? The record contains no evidence that all the postdivorce profits would miraculously have materialized without any postdivorce effort by Gene Roddenberry. All the evidence is to the contrary.

In her effort to avoid the effect of the Edelman declaration, the first Mrs. Roddenberry relies heavily on an expert's opinion that the postdivorce personal service fees paid to Gene Roddenberry were adequate, and the following conclusion that all profits additionally paid must therefore be attributable to predivorce services. This testimony does not constitute substantial evidence of contractual intent in 1969. This evidence was not even offered in phase I, when the contract was interpreted, but rather in a later damages phase. It was not the basis on which the court interpreted the contract. The court's contract interpretation was instead based on the discredited "continuation" theory. Moreover, the expert obviously had no knowledge of the parties' contractual intent in 1969, and the actual evidence of contractual intent supports only the finding that half the Star Trek 1 profits were allocated to the first Mrs. Roddenberry. Without the grounding proof that the first Mrs. Roddenberry was to share in profits from postdivorce projects, expert testimony can prove nothing. (*Pacific Gas & Electric Co.* v. *Zuckerman, supra,* 189 Cal.App.3d 1113, 1135.) Additionally, the expert testimony fails to establish that the profits were paid for predivorce work. The testimony was not based on evidence of valuations actually made by the parties to the contracts which yielded the postdivorce profits, but

---

[21]As in *Mikialian* v. *City of Los Angeles, supra,* 79 Cal.App.3d 150, her own testimony was internally inconsistent when she ratified the Edelman declaration as true while also testifying to contrary claims. The *Mikialian* court cited such inconsistency as one factor supporting its finding of no substance to the testimony there involved.

rather on observations of general market conditions which were not proven to be standard and uniform. Finally, the testimony simply failed to establish that all the postdivorce profits would have been generated without Gene Roddenberry's postdivorce input, or that Norway would have received the same amount of profits even without postdivorce work by Gene Rodden-berry. To accept the contention that Gene Roddenberry's postdivorce efforts contributed absolutely nothing to postdivorce profits in the face of this record would be to accept the type of "irrational finding" decried by Justice Traynor. (See *People* v. *Johnson, supra,* 26 Cal.3d 557, 577-578.)[22]

*The Star Trek 2 and 3 judgment is not supported by substantial evidence.*

Both the "literary property" and the "all profits are pre-divorce profits" arguments are simply abstract arguments. They might be adequate as theories of pleading, but at trial more than theory is needed—evidence is needed. Semantical theories may justify the admission of parol evidence, but the ultimate judgment cannot be based on arbitrary acceptance of a theoretical meaning which has no evidentiary support while an alternative meaning supported by evidence is arbitrarily rejected.

The inconsistent verdict here, however, was not based on either the "literary property" or "all profits are pre-divorce profits" arguments. Rather, it was the product of the mistaken assumption that if Star Trek 2 and 3 can be called "continuations" of Star Trek 1, it must necessarily follow that the first Mrs. Roddenberry owns a share of the Star Trek 2 and 3 profits. This does not follow. The question was one of contractual intent and should have been decided according to the same contractual intent analysis that resulted in a defense verdict on the animations, movies and merchandising. The inconsistency of the verdict yielded by the deviation from contractual intent analysis highlights the error.

### THE PUNITIVE AWARD FOR FRAUD

*The facts.*

When Norway began receiving profit participation payments in 1984 for Star Trek 1 syndications, Norway initially forwarded a full half to the first

---

[22]If the first Mrs. Roddenberry had been able to lay a foundation for entitlement to something beyond Star Trek 1 profits, she might possibly have been able to prove some fractional allocation of postdivorce profits to predivorce creation of the Star Trek concept, assuming this quasi-copyright licensor claim could survive the allocation of the copyrights to Gene Roddenberry via Norway. However, she made no attempt to prove a contractual right to a fractional contribution. Instead, she claimed everything, despite the lack of evidence to support that broad claim. She was the plaintiff and bore the burden of proof. She sought everything; she failed to prove everything; she therefore loses.

Mrs. Roddenberry. Gene Roddenberry, however, felt that he should receive compensation from her for his postdivorce promotional efforts. It was a plausible claim. His postdivorce efforts arguably created a common fund in which she was sharing. For her to share in such a fund without contributing to the expenses of its creation could constitute unjust enrichment. Gene Roddenberry and his advisers therefore concluded that Norway would not pay a full half to the first Mrs. Roddenberry, but instead only one-third.

Although the unjust enrichment theory was plausible in the abstract, it was flawed in both conception and implementation. First, it was directly contrary to the express terms of the 1969 settlement agreement and judgment, both of which provided for the first Mrs. Roddenberry to receive her half "without deduction or offset of any kind." Second, when Norway began remitting only one-third rather than one-half to the first Mrs. Roddenberry, Norway misrepresented or at least concealed that fact. The initial letter from Norway's accountant advised the first Mrs. Roddenberry that she was receiving "one-half of the gross monies received," and a second told her that she was receiving "fifty percent." The first letter stated that "no deduction" had been made for Gene Roddenberry's postdivorce efforts, nor for "legal, accounting or other expenses incurred," and that "no attempt has been made at this time to seek compensation or reimbursement to Mr. Roddenberry for his personal efforts and expenditures over the years." Later, when the portion being paid was reduced to one-third, the accountant's letters stated only that a check was enclosed "[a]s per my prior correspondence." No advice was given that the amount of the check was only one-third of the profit participation payments made to Norway. Only shortly before trial did Norway pay the withheld sums plus interest.

*Liability.*

These facts support the finding of liability on at least a theory of concealment, if not affirmative misrepresentation as well. (Civ. Code, §§ 1572 and 1710.)

". . . [T]he elements of an action for fraud and deceit based on a concealment are: (1) the defendant must have concealed or suppressed a material fact, (2) the defendant must have been under a duty to disclose the fact to the plaintiff, (3) the defendant must have intentionally concealed or suppressed the fact with the intent to defraud the plaintiff, (4) the plaintiff must have been unaware of the fact and would not have acted as he did if he had known of the concealed or suppressed fact, and (5) as a result of the

concealment or suppression of the fact, the plaintiff must have sustained damage. (BAJI No. 12.35 (7th ed. 1986).)" (*Marketing West, Inc.* v. *Sanyo Fisher (USA) Corp.* (1992) 6 Cal.App.4th 603, 612-613 [7 Cal.Rptr.2d 859].)

 Each element is satisfied here. Norway was under a duty to disclose because it was handling money belonging to the first Mrs. Roddenberry. Even if a fiduciary relationship is not involved, a nondisclosure claim arises when the defendant makes representations but fails to disclose additional facts which materially qualify the facts disclosed, or which render the disclosure likely to mislead. (*Warner Constr. Corp.* v. *City of Los Angeles* (1970) 2 Cal.3d 285, 294 [85 Cal.Rptr. 444, 466 P.2d 996]; Civ. Code, § 1710, subd. 3.) The evidence amply supported the finding that Norway concealed the true facts in the hope that the first Mrs. Roddenberry would accept Norway's payments and never discover that she was receiving only a third.

Norway contends that evidence of reliance and damage is lacking. To the contrary, substantial evidence supports the conclusion that the first Mrs. Roddenberry was misled or at least confused and consequently delayed pressing for full payment. Delay in receiving full payment can constitute actual damage.

*The punitive award.*

Since she had been paid by the time of trial, the first Mrs. Roddenberry was awarded only punitive damages on her fraud claim. By statute, punitive damages were not available against Gene Roddenberry's estate. (Former Prob. Code, § 573.)[23] Punitive damages were assessed only against Norway.

 Norway contends that the statutory ban on punitive damages after death should be extended to awards against a decedent's loan-out corporation. This is an issue of first impression. The proposition that such awards should be banned rests on a distinction between the punitive and exemplary aspects of a punitive/exemplary award. The distinction was recognized in *Evans* v. *Gibson* (1934) 220 Cal. 476, 490 [31 P.2d 389], which stated that since ". . . the purpose of punitive damages is to punish the wrongdoer for his acts, accompanied by evil motive, and to deter him from the commission of like wrongs in the future, the reason for such damages ceases to exist with his death. It is true that the infliction of punishment serves as a deterrent to

---

[23]Probate Code section 573 was repealed and replaced by Code of Civil Procedure section 377.42, which likewise bars punitive damages against a decedent or estate, but applies only to actions commenced after January 1, 1993.

the commission of future wrongs by others, as well as by the wrongdoer, but punitive damages by way of example to others should be imposed only on actual wrongdoers." (*Id.* at p. 490.) Thus although the exemplary function of a punitive/exemplary award can still be performed by an award against the wrongdoer's estate, the exemplary function without the punitive is not considered sufficient to justify the imposition of punitive/exemplary damages. Hence the Legislature has outlawed such awards.

Here, however, we deal not with an award against an estate, but rather with an award against a continuing legal entity. Norway held various contractual rights at the time of Gene Roddenberry's death. All evidence is that it continues to hold contractual rights and to conduct business exploiting them after his death.[24] We find no evidence in the record that a punitive/exemplary award against Norway is not capable of serving its deterrent function in both the punitive and the exemplary aspects. The punitive damage award is therefore affirmed.

## CONCLUSION

This is a case that should never have been. It was clear from the outset that the first Mrs. Roddenberry was entitled to half the profit participation payments on Star Trek 1 "without deduction or offset of any kind." It was equally clear that she had no interest in other Star Trek projects and "was not to participate" in income from Gene Roddenberry's postdivorce efforts. It is now clear that she is additionally entitled to the jury's award for fraud. Each side to bear its own costs on appeal.

Nott, J., concurred.

**FUKUTO, Acting P. J.,** Concurring and Dissenting.—I concur in the majority opinion to the extent it affirms that portion of the judgment which denied Eileen Roddenberry profits from postdivorce animations, movies, and merchandising, and awarded her $900,000 in punitive damages for fraud. However, I respectfully dissent from the opinion insofar as it reverses her award of profit participation income from "Star Trek 2" and "Star Trek 3."

Gene and Eileen Roddenberry came into the divorce with their community property interests in Norway, which, in turn, held an ownership interest in a

---

[24]We grant the first Mrs. Roddenberry's request for judicial notice that the second Mrs. Roddenberry petitioned the probate court for payment of $200,000 per year in compensation for services as Norway's president. This illustrates the ongoing nature of Norway's business and Norway's continuing susceptibility to punishment.

"science fiction property entitled 'Star Trek.'" The *Star Trek* television series, after generating a multimillion-dollar deficit during its three years on the air, had been canceled. Despite the failure of the series, Eileen Roddenberry consented to a divorce settlement agreement whereby she would retain her community property interest in "any profit participation interest in 'Star—Trek,'" while otherwise relinquishing all interest in Norway. Consistent therewith, Gene Roddenberry agreed to transfer her "[a] one-half interest in all future profit participation income from 'Star Trek' to which [Eileen Roddenberry] and/or [Gene Roddenberry] are entitled."

At trial, Eileen Roddenberry contended it had been the intention of the parties, when they negotiated their 1969 settlement agreement, that she would retain her community property interest in one-half of any and all profits generated by future exploitations of Star Trek, regardless of their form. The defendants, on the other hand, maintained the parties had intended to transfer all of Norway to Gene Roddenberry, except for Eileen Roddenberry's retention of a profit participation interest in the original, then-defunct *Star Trek* television series.

Since the Roddenberrys' settlement agreement had failed to define precisely what was meant by the phrase " 'Star-Trek,' "[1] the language of the divorce decree incorporating that agreement was reasonably susceptible of either of the interpretations asserted by the parties, as well as others. Thus, the trial court properly admitted extrinsic evidence to aid it in determining the parties' intent at the time the settlement agreement was negotiated. After considering the extrinsic evidence, which was subject to multiple, conflicting inferences and required resolution of credibility issues, the trial court concluded Eileen Roddenberry was entitled to receive profit participation income from the original *Star Trek* series and any "successors, sequels and spin-offs," but not from *Star Trek*-related animations, movies, or merchandising. The court provided a reasoned basis for construing the decree as it did and that is all that is required to warrant an affirmance on appeal under the substantial evidence test.

I am unpersuaded that the trial court, in focusing on whether Star Trek 2 was a "continuation" of the original *Star Trek*, lost sight of the underlying issue in the case, i.e., "the extent and scope of the rights of [Eileen Roddenberry] in Norway's profit participation income from STAR TREK as determined and delineated by the divorce decree." The defendants argued below that the decree could not reasonably be construed to include Star Trek

---

[1] " 'Star-Trek' " was merely identified as one of numerous "literary properties, concepts reduced to writing, contracts, commitments and written submissions . . . ."

2 because it had "nothing to do with the original" series. The court rejected that notion, explaining in detail why Star Trek 2 should be considered a continuation of the original series and Star Trek 3 a sequel to Star Trek 2. The court's analysis was relevant in demonstrating that these series fit into the category of Star Trek exploitations for which the parties had intended Eileen Roddenberry to receive profit participation income.

A petition for a rehearing was denied May 3, 1996, and the petition of appellant Eileen A. Roddenberry for review by the Supreme Court was denied July 31, 1996.