Filed 8/26/16  P. v. Lambert CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JOHN FREDERICK LAMBERT,<br><br>    Defendant and Appellant. | H040795<br>(Santa Clara County<br>Super. Ct. No. C9941876) |

Defendant John Frederick Lambert appeals from an order extending his involuntary commitment as a mentally disordered offender (MDO).  He argues there is insufficient evidence he currently poses a substantial risk of physical harm to others.  For the reasons set forth below, we affirm.

**BACKGROUND**

1. *Defendant's Commitment*

In October 1999, defendant pleaded guilty to a count of auto burglary (Pen. Code, §§ 459, 460)[1] and nolo contendere to a count of criminal threats (§ 422).  The following month, the trial court suspended imposition of sentence and placed him on three years' probation.

In March 2000, the Santa Clara County Probation Department notified defendant he was in violation of his probation.  Thereafter, the trial court reinstated probation.  In June 2000, defendant was again found to be in violation of his probation.

---

[1] Unspecified statutory references are to the Penal Code.

Defendant admitted the probation violation. The trial court revoked probation and sentenced him to 16 months in prison with credit for 330 days.

On February 23, 2005, the Santa Clara County District Attorney's Office filed a petition seeking to compel defendant to submit to involuntary treatment for one year under section 2970. The trial court granted the petition. Defendant was committed to Atascadero State Hospital.

Between 2006 and 2013, the district attorney's office petitioned for and received multiple court orders recommitting defendant for an additional year. In February 2013, defendant was transferred to the Napa State Hospital.

On August 29, 2013, the district attorney's office filed a petition to involuntarily recommit defendant to the department of mental health through March 7, 2015. The petition alleged that defendant continued to suffer from a severe mental disorder, the mental disorder was not in remission and could not be kept in remission without treatment, and due to his mental disorder defendant was a substantial danger of physical harm to others. Defendant and the prosecution waived a jury trial. On February 27, 2014, the trial court held a court trial on the recommitment petition.

2. *The Court Trial*

Dr. Dave Auluck, a staff psychiatrist at Napa State Hospital, qualified as an expert in the fields of rendering psychiatric diagnoses and risk assessment. Dr. Auluck had been treating defendant since December 2013. Defendant suffered from schizoaffective disorder, bipolar type disorder, and polysubstance abuse.

Dr. Auluck explained that a schizoaffective disorder is a type of psychotic disorder that causes a person to suffer from delusions or hallucinations for a majority of the time. Patients suffering from schizoaffective disorder may also have a mood disorder. In defendant's case, he had a bipolar mood disorder that can also be present at various times.

2

Defendant had acknowledged he suffered from auditory hallucinations.  He also had delusions, including a delusion that he believed that "God and the devil are going to take his body and replace him with someone else."  He had hallucinations as recent as July 2013.  Defendant had previously requested medication after hearing voices.  Since July 2013, defendant had not affirmatively acknowledged he was hearing voices.  Dr. Auluck explained that others had suspected defendant of "potentially hearing voices" at times, and defendant was "potentially reluctant to share that with members of his treatment team or other people."

When asked if there was any evidence that defendant may be suffering from hallucinations, Dr. Auluck explained that "isolation and not interacting with others can be viewed as a potential red flag for hearing voices in a patient who's previously done so."  In January 2014, defendant stopped taking his medication for about a week.  Dr. Auluck tried to speak to him about resuming his medications.  Defendant responded that he was a "2972" and did not need to take medication.  At that point, hospital staff requested a "*Harper* or a *Qawi* hearing."[2]  After the request was made, defendant began taking his medication voluntarily.  Following the hearing, hospital staff obtained an order allowing them to administer injectable medication in the event he stopped taking oral medication.

When defendant stopped taking his medication, he became more isolated and would stay in his own room more often.  He did not take part in routine daily activities, such as showering, and was less likely to go to the dining hall.  When Dr. Auluck attempted to speak to him, defendant would remain fixated on objects like a blank wall, which suggested to Dr. Auluck that he may be responding to internal stimuli.  After defendant resumed his medication, Dr. Auluck noticed a marked improvement in his

---

[2] Presumably, this was a reference to an administrative hearing authorized under *Washington v. Harper* (1990) 494 U.S. 210, 221 to obtain a temporary, emergency forced medication order.

3

behavior. Defendant was noticeably "brighter," would go to the dining room to eat, and would speak to Dr. Auluck during his checkups. Dr. Auluck opined that defendant's medication was crucial to his mental health.

Dr. Auluck diagnosed defendant with polysubstance dependence due to his history of using alcohol, marijuana, methamphetamines, cocaine, and heroin. Dr. Auluck believed defendant's polysubstance dependence and schizoaffective disorder made him prone to criminality in the future.

Defendant acknowledged he had bipolar disorder. It appeared that he had insight into his mental illness, but only sometimes. Sometimes defendant believed his medications helped with his symptoms and willingly took them, but sometimes he believed he did not have to take medication. Other times, defendant believed the medications were harmful like some of the substances he had abused in the past. There were times when defendant appeared to understand the connection between his mental illness and his crimes. On occasion, he recognized the warning signs of his illness. Dr. Auluck was not sure why defendant did not always recognize his symptoms and only sometimes had insight into his illness. Dr. Auluck opined that his mental illness or psychosis could be a factor.

Dr. Auluck believed that due to his mental disorder, defendant, if untreated, remained a substantial danger of physical harm to others. Dr. Auluck believed defendant would become dangerous if he failed to take his medication or if he abused substances again. Dr. Auluck believed defendant's variable insight, combined with his variable compliance with taking his medication, made him dangerous.

As defendant's treating physician, Dr. Auluck attested he would like to see defendant move to a transition unit or a discharge unit, and engage with core treatment groups. Dr. Auluck believed that attending groups would allow defendant to gain insight into his mental illness. Defendant had mistakenly attended one group session and had done well participating in that group.

4

Defendant did not have problems with his peers. He also had not committed any acts of verbal aggression or physical aggression in the past year. One of Dr. Auluck's concerns was defendant's history of physical aggression, dating back to his original crime in 1999.

Defendant had good family support. His mother and stepfather were concerned about him and visited him on a regular basis.

3. *The Court's Decision*

Following the hearing, the court granted the petition and extended defendant's commitment through March 7, 2015.[3]

## DISCUSSION

Defendant argues we must reverse his commitment order, because there is insufficient evidence he represents a substantial danger of physical harm to others. We disagree and find there is sufficient evidence supporting the commitment order.

1. *Statutory Framework and Standard of Review*

"In considering the sufficiency of the evidence to support MDO findings, an appellate court must determine whether, on the whole record, a rational trier of fact could have found that defendant is an MDO beyond a reasonable doubt, considering all the evidence in the light which is most favorable to the People, and drawing all inferences the trier could reasonably have made to support the finding. [Citation.] ' " 'Although we must ensure the evidence is reasonable, credible, and of solid value, nonetheless it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts on which that determination depends. [Citation.] Thus, if the [finding] is supported by substantial evidence, we must accord due deference to the

---

[3] Defendant was since recommitted to the department of mental health until March 7, 2016. He was recommitted again until March 7, 2017.

5

trier of fact and not substitute our evaluation of a witness's credibility for that of the fact finder. . . .' " ' " (*People v. Clark* (2000) 82 Cal.App.4th 1072, 1082-1083.)

"Under the MDO law, continued treatment requires that the person satisfy certain criteria:  that (1) he continues to have a severe mental disorder; (2) his mental disorder is not in remission or cannot be kept in remission without treatment; and (3) he continues to present a substantial danger of physical harm to others." (*People v. Beeson* (2002) 99 Cal.App.4th 1393, 1398-1399; § 2972, subd. (a).)  In this case, defendant only contests the sufficiency of the evidence supporting the third criterion—that he continues to pose a substantial danger of physical harm to others.

2. *Sufficiency of the Evidence*[4]

Defendant argues Dr. Auluck's testimony does not support a determination that he is dangerous.  He also claims the record as a whole does not support the dangerousness finding.  We disagree.

A single opinion by a psychiatric expert that a person is currently dangerous due to a severe mental disorder can constitute substantial evidence to support the extension of a commitment.  (See *People v. Bowers* (2006) 145 Cal.App.4th 870, 879.)  However, "[e]xpert opinion testimony constitutes substantial evidence only if based on conclusions or assumptions supported by evidence in the record.  Opinion testimony which is conjectural or speculative 'cannot rise to the dignity of substantial evidence.' " (*Roddenberry v. Roddenberry* (1996) 44 Cal.App.4th 634, 651.)

---

[4] This appeal is taken from the order extending defendant's commitment to March 7, 2015.  This term has already expired.  Nonetheless, we will address the merits of the petition.  As the People and defendant state that defendant has since been recommitted twice, with the latest recommitment extending to March 7, 2017.  Accordingly, we find the appeal is not moot, because a decision in this case could affect the trial court's jurisdiction over future recommitment proceedings.  (*People v. J.S.* (2014) 229 Cal.App.4th 163, 170; *People v. Fernandez* (1999) 70 Cal.App.4th 117, 134.)

Here, Dr. Auluck testified that defendant posed a substantial danger of physical harm to others. Defendant, however, argues that Dr. Auluck's testimony was largely based on conjecture and speculation. Defendant claims Dr. Auluck merely hypothesized that defendant may be dangerous if he was released, stopped taking his medication, and began abusing other substances.

Although expert opinion testimony cannot be speculative in order to constitute substantial evidence, an expert's testimony in civil commitment cases on the dangerousness of a person is often the only evidence available. (*People v. Ward* (1999) 71 Cal.App.4th 368, 374.) Furthermore, a " 'substantial danger of physical harm to others' " is without definition; "it appears to mean a prediction of future dangerousness by mental health professionals." (*In re Qawi* (2004) 32 Cal.4th 1, 24 (*Qawi*).)

We do not agree with defendant that Dr. Auluck's testimony was merely speculative. Dr. Auluck testified that defendant had stopped taking his medication for a week during the past year. And he testified that defendant suffered from polysubstance dependence. Dr. Auluck's opinion about the possibility that defendant may stop taking his medication and abuse other substances in the future was not speculative; it was grounded in evidence.

Defendant also points out that he had no episodes of violence or aggression in the year prior to the hearing. The MDO Act, however, specifically states that a " 'substantial danger of physical harm' does not require proof of a recent overt act." (§ 2962, subd. (f); *Qawi*, *supra*, 32 Cal.4th at p. 24.) The fact that defendant had no recent acts of violence did not mean he was not a substantial danger to others.

Nonetheless, defendant insists he did not exhibit violent or dangerous behavior even during the week that he failed to take his medication. He also argues that his delusions and hallucinations are not violent and do not encourage him to engage in violent behavior. He claims these facts demonstrate he is no longer dangerous. We disagree. Defendant's lack of recent violence in a controlled institutional setting does not

7

necessarily prove that he no longer poses a substantial risk of danger if placed *outside* the controlled setting. (See *People v. Sumahit* (2005) 128 Cal.App.4th 347, 353.)

Furthermore, defendant resumed taking his medication only after he was told that hospital staff was in the process of obtaining an order to force him to take medication. And Dr. Auluck opined that defendant's compliance with medication was very important to maintaining his mental health. In this case, Dr. Auluck testified that defendant *sometimes* had insight into his criminal acts and his mental illness. And defendant *sometimes* believed that taking medication would help him with his mental disorder. Thus, Dr. Auluck's testimony was that defendant did not always have insight into his criminal acts, his mental illness, or understand the importance of taking his medication. In part, Dr. Auluck's assessment that defendant remained dangerous was rooted in defendant's variable insight and variable compliance with his medication. And Dr. Auluck explained that in his opinion, defendant would become dangerous again if he failed to take his medication.

Defendant insists the rest of the record, including his mental health evaluations, indicate he is no longer violent. Although there may be evidence that defendant has made progress, there was also evidence that he remained dangerous. We do not reweigh the evidence as the reviewing court. The credibility of expert witnesses, including Dr. Auluck, and the weight to be given to their testimony are matters exclusively determined by the trier of fact. (*People v. Clark*, *supra*, 82 Cal.App.4th at p. 1082.) Reviewing the record, substantial evidence, in the form of Dr. Auluck's testimony, supports the court's finding that defendant's mental disorder caused him to remain a substantial danger of physical harm to others.

Accordingly, we affirm the order extending defendant's commitment.

### DISPOSITION

The order is affirmed.

8

_____
Premo, J.

WE CONCUR:

_____
Rushing, P.J.

_____
Grover, J.