Filed 8/30/16  Darling v. Redwine CA5

<u>**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| BRADFORD DARLING,<br><br>  Plaintiff and Appellant,<br><br>  v.<br><br>DEBRA L. REDWINE,<br><br>  Defendant and Respondent. | F071429<br><br>(Super. Ct. No. S-1500-CV-279420)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  David R. Lampe, Judge.

Law Office of Timothy L. Kleier, Timothy L. Kleier; Pape & Shewan and Scott R. Shewan for Plaintiff and Appellant.

Klein, DeNatale, Goldner, Cooper, Rosenlieb & Kimball, Catherine E. Bennett, Joseph D. Hughes and Kurt D. VanSciver for Defendant and Respondent.

-ooOoo-

Plaintiff appeals from the judgment in his declaratory relief action, which sought a determination of the ownership of six investment accounts held by decedent in trust for plaintiff prior to decedent's death.  Plaintiff contends the disposition of the accounts was governed by the Uniform TOD Securities Registration Act, which the trial court failed to apply.  Defendant, the executor of the decedent's will and the successor trustee of her family trust, contends decedent, prior to her death, revoked the trusts in which the

investment accounts were held; as a result, they became part of the family trust. The trial court found in favor of defendant as to three of the accounts. We affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

Decedent, Flora Darling (Flora),[1] married Lansing Darling (Lansing), the father of plaintiff, Bradford Darling (Darling), in 1959, when Darling was a boy. Flora and Lansing had no other children. Flora treated Darling as her son. When Lansing died in 1987, he left his entire estate to Flora.

In 1998, Flora created the Flora L. Darling Living Family Trust (family trust); at the same time, she executed a pour over will, leaving her estate to the family trust. The family trust instrument provided that, on Flora's death, the remainder of the trust estate was to be distributed 25 percent to Darling, 25 percent to defendant, Debra Redwine, Flora's grandniece, and 25 percent each to Flora's two nephews, Bill McDonald and Thomas McBroom. Redwine was named executor of Flora's will and successor trustee of the family trust.

Flora died on February 13, 2012. Prior to her death, Flora was the owner of six investment accounts with five mutual fund companies. Title to each account indicated she held the account in her name, as trustee for the benefit of Darling. For each account, she had executed a Declaration of Trust—Revocable, dated 1989 or 1990. After Flora's death, Redwine went through her papers; among the papers in Flora's office, she discovered the declarations of trust for three of the stock accounts[2] folded together with a handwritten note on the outside, reading: "Revoked by Flora L Darling Living Family

---

[1] We refer to Flora and Lansing by their first names for convenience, because they share a last name with Darling. No disrespect is intended.

[2] The three declarations of trust in issue in this appeal were for Growth Fund of America (referred to as the American Funds account), Franklin California Tax Free Income Fund (referred to as the Franklin Templeton account), and California Tax Exempt Bond Fund (referred to as the Virtus account). The three declarations of trust not in issue were for Dreyfus GNMA Fund, Dreyfus Strategic Income Fund, and California Tax Exempt Money Market Fund (referred to as the Putnam account).

Trust 1998," followed by a "scribble" Redwine identified as Flora's initials. Redwine found a second set of the same declarations of trust, also folded together with a handwritten note on the outside, reading: "Revoked CK Flora L Darling Living Family Trust 1998," also with a scribble Redwine identified as Flora's initials.

Darling attempted to have the six stock accounts transferred into his name, based on the title to the accounts, but succeeded in having only two of them transferred to him. Redwine attempted to have the accounts transferred to her as successor trustee of Flora's family trust. She obtained the funds from one account. Darling filed this declaratory relief action against Redwine, as successor trustee of Flora's family trust, seeking a determination of ownership of the six disputed stock accounts. His first amended complaint alleged the six accounts were set up as Totten trusts and declarations of trust, so that each account was a separate trust and not part of Flora's family trust. He further alleged that each account absolutely and irrevocably vested in him as the sole beneficiary upon Flora's death. The first amended complaint alleged there was an actual controversy between the parties regarding ownership of the stock accounts, which required a judicial determination of the rights and obligations of the parties.

The trial court concluded that Flora revoked the stock trusts holding the three accounts whose trust instruments were folded together with "revoked" written on the outside; it entered a judgment determining title to those accounts was transferred to Redwine as trustee of the family trust on Flora's death. It concluded there was insufficient evidence to find Flora revoked the remaining three stock trusts; the judgment determined title to those accounts transferred to Darling on Flora's death. Darling appeals.

### *DISCUSSION*

I.  **Motion to Strike Addendum to Appellant's Brief**

At trial, prior to Darling's testimony, the parties discussed whether his testimony could be shortened by using the statement of facts included in his written statement in

3.

lieu of oral opening statement as his direct testimony, then subjecting him to oral cross-examination. The trial court pointed out the portions of the written statement it thought would be appropriate for that purpose. The parties then stipulated that specified portions of the written statement would be admitted as Darling's direct testimony, but without stipulating to the accuracy or veracity of the testimony.

Darling attached to his opening brief "Addendum A" and "Document 91." Addendum A, a declaration of his counsel, explained that document No. 91 is a copy of the written statement, redacted to include only the portions the parties stipulated would be used as Darling's direct testimony. Redwine moved to strike addendum A and document No. 91, contending document No. 91 was improper as an attachment to the brief because she refused to agree to include it in the joint appendix, so the redacted document was not a part of the record (although the complete document was), and the addendum and document exceeded the 10-page limit for attachments to briefs. (Cal. Rules of Court, rules 8.120(a), 8.204(d).)[3]

Rule 8.204(d) permits a party filing a brief to attach "copies of exhibits or other material in the appellate record" to its brief. It provides that "attachments must not exceed a combined total of 10 pages, but on application the presiding justice may permit additional pages of attachments for good cause." (Rule 8.204(d).) The unredacted document is part of the record. The redacted document was attached to Darling's brief for the convenience of the court, to segregate the portions admitted as his testimony from the portions that were not. The addendum and document No. 91 together consist of 10 pages containing at least some writing, a cover page for document No. 91, and a few additional blank pages where the writing was redacted in its entirety.

We find document No. 91 to be a useful and convenient means of reviewing the direct testimony of Darling. To the extent the page limitation may have been technically

---

**3**     All further references to rules are to the California Rules of Court.

4.

exceeded, we disregard the noncompliance with rule 8.204(d). (Rule 8.204(e)(2)(C).) The motion to strike is denied.

## II. Uniform TOD (Transfer on Death) Security Registration Act

Darling contends the manner in which the three stock accounts in issue were held made them securities registered in beneficiary form, subject to the "Uniform TOD Securities Registration Act" (Prob. Code, §§ 5500–5512; the Act).[4] Under the Act, he contends, on Flora's death, the accounts passed to him as the beneficiary, without probate or estate administration. (§§ 5500, subd. (c), 5507.) We conclude the Act does not apply to these accounts.

Under the Act, on the death of the owner of securities registered in beneficiary form, ownership passes to the beneficiary. (§ 5507.) "A security, whether evidenced by certificate or account, is registered in beneficiary form when the registration includes a designation of a beneficiary to take the ownership at the death of the owner or the deaths of all multiple owners." (§ 5504.) "'Beneficiary form' means a registration of a security that indicates the present owner of the security and the intention of the owner regarding the person who will become the owner of the security upon the death of the owner." (§ 5501, subd. (a).) "Registration in beneficiary form may be shown by the words 'transfer on death' or the abbreviation 'TOD,' or by the words 'pay on death' or the abbreviation 'POD,' after the name of the registered owner and before the name of a beneficiary." (§ 5505.) For example, when there is a sole owner and sole beneficiary, the title might read: "John S. Brown TOD (or POD) John S. Brown, Jr." (§ 5510, subd. (c)(1).) The purposes of the Act "are to (1) encourage development of a title form for use by individuals that is effective, without probate and estate administration, for transferring property at death in accordance with directions of a deceased owner of a

---

**4** All further statutory references are to the Probate Code unless otherwise indicated.

security as included in the title form in which the security is held and (2) protect issuers offering and implementing the new title form." (§ 5500, subd. (c).)

The American Funds account bore the title: "FLORA L. DARLING TTEE, FBO BRADFORD J. DARLING, UDT 01/10/89," meaning Flora L. Darling, trustee, for the benefit of Bradford J. Darling, under declaration of trust 01/10/89. The Franklin Templeton and Virtus accounts bore similar titles.[5] None of the account titles included a "TOD" or "POD" designation. Darling contends the "FBO" designation had the same effect as a "TOD" or "POD" designation. We disagree.

Initially in this action, Darling claimed the stock accounts were Totten trusts by reason of the manner in which they were held. A Totten trust account is defined as: "an account in the name of one or more parties as trustee for one or more beneficiaries where the relationship is established by the form of the account and the deposit agreement with the financial institution and there is no subject of the trust other than the sums on deposit in the account.… A Totten trust account does not include … a regular trust account under a testamentary trust or a trust agreement which has significance apart from the account." (§ 80.) Apparently conceding the accounts in this case are not deposit accounts with a financial institution,[6] Darling now essentially contends securities registered in beneficiary form under the Act include a securities account that is the equivalent of a Totten trust with a financial institution. We conclude the Act does not express an intent that a stock account held by the owner for the benefit of another is the equivalent of a TOD or POD account under the Act.

---

[5] The Franklin Templeton account title was: "FLORA L. DARLING TRSTE, FBO BRADFORD J. DARLING, UDT DTD 1-10-89." The title of the Virtus fund account was: "FLORA L. DARLING TTEE, FBO BRADFORD J. DARLING, DTD 01/10/89."

[6] See definition of "financial institution" in sections 40, 5128, and definition of "account" in section 5122, subdivisions (a), (b).

6.

The "Multiple-Party Accounts Law" (§§ 5100–5407), which governs deposit accounts with financial institutions, contains express provisions for handling Totten trust accounts. For example, the beneficiary of a Totten trust account has no rights to sums on deposit during the life of the trustee, but on the death of the sole trustee, any amount remaining on deposit belongs to the person named as beneficiary, unless there is clear and convincing evidence of a different intent. (§§ 5301, subd. (e), 5302, subd. (c).) The Totten trust account may be paid to the beneficiary on proof of death of the trustee. (§ 5404.) If the account is held in the name of one person as trustee for another, the financial institution may treat it as a Totten trust, if it has no notice in writing that the account is not a Totten trust. (§ 5406.) Thus, "if it is unknown to the financial institution that the funds on deposit are subject to a trust created other than by the deposit of the funds in the account in trust form," the financial institution is protected from liability for paying in accordance with the governing statutes. (Cal. Law Revision Com. com., Deering's Ann. Prob. Code (2004 ed.) foll. § 5406, p. 645.)

There are no similar provisions in the Act addressing stock accounts held by the owner as trustee for the benefit of a named beneficiary. The Act, in describing and giving examples of registration in beneficiary form, cites only the designations "'TOD,'" "'POD,'" "'transfer on death,'" and "'pay on death.'" (§§ 5505, 5510, subd. (c).) It does not mention "FBO," "for the benefit of," or "in trust for the benefit of."

Further, the Probate Code contains a separate division governing trusts. (§§ 15000–19403.) It applies to all trusts (§ 15001), including trusts created by a "declaration by the owner of property that the owner holds the property as trustee." (§ 15200, subd. (a).) The definition of "trust" includes "[a]n express trust, private or charitable, with additions thereto, wherever and however created." (§ 82, subd. (a).) It expressly excludes "Totten trust accounts." (§ 82, subd. (b)(4).) There is no exclusion for Totten trust-like securities accounts, held by the owner as trustee for the benefit of a beneficiary.

7.

Additionally, the definition of a Totten trust account expressly excludes "a regular trust account under a testamentary trust or a trust agreement which has significance apart from the account." (§ 80.) Accordingly, a Totten trust account is one which relies for its existence on the manner in which title to the account is held and any terms and conditions imposed by the financial institution where the account is maintained. It does not exist as a result of a separate declaration of trust containing terms and conditions of the trust. Even if we were to recognize a securities account in a form like a Totten trust as a securities account registered in beneficiary form under the Act, the designation would not apply to an account held in a trust created by a declaration of trust, rather than an account held in trust only because of the designation in the account title. For each account in issue, Flora executed a written declaration of trust, setting out the terms of the trust. The title to each account does not simply indicate Flora holds the account in trust for Darling, it indicates the account is held in trust pursuant to a declaration of trust. Accordingly, the accounts are not the securities account equivalent of a Totten trust account with a financial institution.

If the Legislature had wished to recognize a Totten trust-like securities account as a securities account registered in beneficiary form under the Act, it could have included in the Act provisions similar to those governing Totten trust accounts in the Multiple-Party Accounts Law. It did not do so; rather, it focused on registrations that include the designations "TOD," "POD," "transfer on death," and "pay on death." Because it did not create or recognize a Totten trust-like designation for securities accounts, we conclude it did not intend the term "securities registered in beneficiary form," as used in the Act, to include a stock account titled in the owner as trustee for the benefit of a named beneficiary, whether pursuant to a declaration of trust or not.

## III.   Revocation Method

The trial court concluded the handwritten and initialed notes on the three folded together trust declarations "carrie[d] the day" and met Redwine's burden of proving

8.

revocation of the stock trusts. It found "Flora Darling intended to revoke, and did revoke, the express trusts that held the Virtus, Franklin Templeton, and American Funds accounts." Darling contends the trust declarations provided an exclusive method of revocation, which Flora failed to follow. Accordingly, he argues the trial court's finding that Flora revoked the three stock account trusts was incorrect as a matter of law.

"The interpretation of a written instrument, including a … declaration of trust, presents a question of law unless interpretation turns on the competence or credibility of extrinsic evidence or a conflict therein. Accordingly, a reviewing court is not bound by the lower court's interpretation but must independently construe the instrument at issue." (*Poag v. Winston* (1987) 195 Cal.App.3d 1161, 1173.) "In construing a trust instrument, the intent of the trustor prevails and it must be ascertained from the whole of the trust instrument, not just separate parts of it. [Citation.] Ordinary words must be given their normal, popular meaning and legal terms are presumed to be used in their legal sense." (*Scharlin v. Superior Court* (1992) 9 Cal.App.4th 162, 168; §§ 21121, 21122.) The parties offered no extrinsic evidence to assist in interpreting the meaning of the revocation provision of the trust declarations, so we are not bound by the trial court's interpretation and must interpret the trust declarations de novo.

Regarding revocation of trusts, the Probate Code provides:

"A trust that is revocable by the settlor or any other person may be revoked in whole or in part by any of the following methods:

"(1) By compliance with any method of revocation provided in the trust instrument.

"(2) By a writing, other than a will, signed by the settlor or any other person holding the power of revocation and delivered to the trustee during the lifetime of the settlor or the person holding the power of revocation. If the trust instrument explicitly makes the method of revocation provided in the trust instrument the exclusive method of revocation, the trust may not be revoked pursuant to this paragraph." (§ 15401, subd. (a).)

9.

The declaration of trust for each of the three stock accounts provided: "I reserve the right at any time to change the beneficiary or revoke this trust, but it is understood that no change of beneficiary and no revocation of this trust, except by death of the beneficiary, shall be effective as to the Company for any purpose unless and until written notice thereof in such form as the Company shall prescribe is delivered to the Custodian Company." Darling contends this constitutes an explicitly exclusive method of revocation, as a result of which Flora could only revoke her trusts by delivering written notice to the investment companies where the accounts were held in the form the companies required. Because it is undisputed she never delivered written notice of revocation to the investment companies, Darling contends the trusts were not revoked.

The trial court, in its tentative decision,[7] determined the revocation provisions were not exclusive, but that no revocation was effective *as to the company* unless a writing was delivered to the company. It noted the trust instruments were "silent as to what other forms of revocation might be effective among disputing beneficiaries."

In the trust declarations, Flora expressly reserved the right to revoke the trusts. The only limitation on revocation of the trusts was that "no revocation … shall be effective as to the Company for any purpose" until written notice was given to the company. Darling focuses on the language "no revocation … shall be effective … for any purpose" without written notice to the company, and asserts this provision represents the exclusive means of revoking the trusts. The key language, however, is the language the trial court noted: "no revocation … shall be effective *as to the Company*" without written notice to the company. (Italics added.) Darling makes no attempt to explain the significance of the phrase "as to the Company" in this provision.

---

[7] We note "[t]he tentative decision does not constitute a judgment and is not binding on the court." (Rule 3.1590(b).) The language cited by Darling was not included in the final statement of decision, and thus does not reflect the trial court's final findings or reasoning.

"The words of an instrument are to receive an interpretation that will give every expression some effect, rather than one that will render any of the expressions inoperative." (§ 21120.) Construing the revocation provision in accordance with the plain meaning of the words used, and giving effect to all of the words used, we conclude the revocation provision did not explicitly make any method of revocation the exclusive method of revocation. (§ 15401, subd. (a)(2).) The language regarding giving notice to the company pertained only to the effect of a revocation on the companies. The effect of the provision was to preclude liability of the companies for honoring the trust provisions in the absence of notice of the revocation of the trust. The reservation of the right to revoke the trust did not specify any means by which revocation was to be accomplished, much less limit the trustor to one exclusive method.

The cases cited by the parties are of limited assistance. In *Gardenhire v. Superior Court* (2005) 127 Cal.App.4th 882 (*Gardenhire*), the question was whether the decedent had validly revoked a trust during her lifetime by executing a will in which she expressly revoked all prior wills, stated her intent to dispose of all of her property by the new will, and included provisions distributing her property differently from the disposition provided for in the trust instrument. (*Id*. at pp. 885–886.) The trust instrument authorized revocation "'by written notice signed by the Trustor and delivered to the Trustee.'" (*Id*. at p. 886.) The court concluded the unqualified term "'written notice'" included a will, delivered by the trustor to herself as trustee. (*Id*. at p. 888.) It noted: "section 15401, subdivision (a)(1) allows a trust to provide any method of revocation. If the trust is silent and does not provide a method, then section 15401, subdivision (a)(2) allows revocation by a writing, other than a will, signed and delivered by the trustor to the trustee during the trustor's lifetime. If the trust is not silent and instead provides a method of revocation, then section 15401, subdivision (a)(2) is inapplicable." (*Gardenhire*, at p. 894, fn. & italics omitted.)

In *Masry v. Masry* (2008) 166 Cal.App.4th 738 (*Masry*), a family trust in which a husband and wife were trustors and trustees provided: "'Each of the Trustors hereby reserves the right and power to revoke this Trust, in whole or in part, from time to time during their joint lifetimes, by written direction delivered to the other Trustor and to the Trustee.'" (*Id*. at p. 740.) The husband executed a notice of revocation, but did not deliver notice of revocation to the wife. (*Id*. at pp. 740–741.) The court observed "'a modification method is explicitly exclusive when the trust instrument directly and unambiguously states that the procedure is the exclusive one.'" (*Id*. at p. 742.) It concluded the revocation provision of the trust was not explicitly exclusive, but provided just one method of revocation in addition to the method provided in section 15401, subdivision (a)(2). (*Masry,* at p. 742.) The court rejected *Gardenhire*'s dictum that "'If the trust is not silent and instead provides a method of revocation, then [Probate Code] section 15401, subdivision (a)(2) is inapplicable.'" (*Masry,* at p. 742.) Instead, "absent language in the trust that its method of revocation is exclusive, the trustor has the option of revoking according to the method provided in Probate Code section 15401, subdivision (a)(2), delivering notice to himself as trustee." (*Id.* at pp. 742–732.) The husband's revocation complied with section 15401, subdivision (a)(2), so the revocation was held valid. (*Masry*, at p. 740.)

In *King v. Lynch* (2012) 204 Cal.App.4th 1186 (*King*), this court addressed modification, rather than revocation, of a trust. We interpreted section 15402, which provides: "'Unless the trust instrument provides otherwise, if a trust is revocable by the settlor, the settlor may modify the trust by the procedure for revocation.'" (*King*, at p. 1192.) Prior to enactment of that section, there was no statute governing modification; courts applied the rules governing trust revocation to trust modification. (*Id*. at p. 1193.) The enactment of separate sections governing revocation and modification indicated the Legislature no longer intended the same rules to apply to both revocation and modification. We construed the phrase "'[u]nless the trust instrument provides

12.

otherwise'" in section 15402 to mean that, if the trust instrument contained any method of modification, then the statutory procedure for revocation did not apply as a method of modification. (*King,* at p. 1193.)

*Gardenhire* concluded the trustor's method of revocation complied with the method set out in the trust instrument. That rule does not apply here, because no method of revocation was set out in the trust instrument. The declaration of trust reserved the trustor's right to revoke, but did not specify a method. It simply provided that any revocation would be ineffective as to the company unless notice of revocation was given to the company.

*Masry* properly rejected the dicta in *Gardenhire* suggesting that, if a trust instrument provides any method of revocation, the method set out in section 15401, subdivision (a)(2) does not apply. That result would only follow if the method provided in the trust instrument were explicitly made the exclusive method of revocation. (§ 15401, subd. (a)(2).) Again, there was no language in Flora's declarations of trust setting out any exclusive method of revoking the trusts.

*King* is not relevant because it construed section 15402 regarding modification of trusts, not section 15401 regarding revocation of trusts.

We find no error in the trial court's implicit determination that the trust declarations did not contain an explicitly exclusive method of revocation, which Flora failed to follow.

## IV. Sufficiency of the Evidence of Revocation

### A. *Standard of review*

Darling argues that Redwine bore the burden of proof of revocation of the stock trusts, and the trial court concluded the two handwritten notes of revocation "'carried the day'" in proving revocation of three of the stock trusts. Darling contends the trial court relied solely on the notes and not on any extrinsic evidence, so the appeal raises a pure issue of law, subject to de novo review.

13.

Darling does not discuss the issue as one of law, focusing only on the notes themselves and their legal significance. Instead, he discusses letters and emails proffered by Redwine to show Flora's intent and testimony he offered to show Flora intended the stock trusts to be kept separate from the family trust. He accuses the trial court of ignoring or forgetting the testimony of his witnesses. He challenges Redwine's credibility regarding the discovery of the trust declarations, and whether they were folded together with the handwritten notes on the outside as she testified. Darling repeatedly asserts the second note was not initialed or signed, ignoring Redwine's trial testimony that both notes bore Flora's initials. He questions whether initialing the notes, rather than signing them, was consistent with Flora's "normal conduct."

Darling has not raised an issue of law subject to de novo review. He challenges the sufficiency of the evidence to support the judgment. Accordingly, we apply the substantial evidence standard of review.

### B.     Sufficiency of the evidence

"An appellant challenging the sufficiency of the evidence to support the judgment must cite the evidence in the record supporting the judgment and explain why such evidence is insufficient as a matter of law." (*Rayii v. Gatica* (2013) 218 Cal.App.4th 1402, 1408.) "When a trial court's factual determination is attacked on the ground that there is no substantial evidence to sustain it, the power of an appellate court begins and ends with the determination as to whether, on the entire record, there is substantial evidence, contradicted or uncontradicted, which will support the determination, and when two or more inferences can reasonably be deduced from the facts, a reviewing court is without power to substitute its deductions for those of the trial court. If such substantial evidence be found, it is of no consequence that the trial court believing other evidence, or drawing other reasonable inferences, might have reached a contrary conclusion." (*Bowers v. Bernards* (1984) 150 Cal.App.3d 870, 873–874, italics omitted.) "'Substantial evidence' is evidence of ponderable legal significance, evidence that is

14.

reasonable, credible and of solid value." (*Roddenberry v. Roddenberry* (1996) 44 Cal.App.4th 634, 651.) "The ultimate test is whether it is reasonable for a trier of fact to make the ruling in question in light of the whole record." (*Id*. at p. 652.)

Initially, we reject Darling's assertion that "The Trial Court clearly states that it relied solely on these cryptic handwritten Notes and no extrinsic evidence." The trial court stated:

> "Finally, there is an express revocation that is written in the decedent's hand and bearing her initials written across documents (exhibits 23 and 24) referring to the Virtus, Franklin Templeton, and American Funds accounts which specifically refers to the 1998 Trust. There is no such document with respect to the Dreyfus or Putnam accounts. It is this evidence that carries the day with respect to the burden of proof as to the Virtus, Franklin Templeton and American Funds accounts. The Court finds that Flora Darling intended to revoke, and did revoke, the express trusts that held the Virtus, Franklin Templeton, and American Funds accounts."

While the trial court found that the handwritten notes on the folded together trust documents effected a revocation of those stock trusts, it did not indicate it considered only those notes, and no extrinsic evidence, in arriving at that conclusion. There was trial testimony regarding how, when, where and by whom the stock trust documents with the handwritten notes were found. The trial court's statements do not indicate it disregarded that evidence in reaching its decision.

Darling asserts one handwritten note was written on the back of a copy of a letter, folded around the three declarations of trust, but nothing was written on any of the declarations of trust themselves. The other handwritten note was written on the back of a copy of the American Funds declaration of trust, which was folded together with copies of the Virtus and Franklin Templeton declarations of trust, but nothing was written on the latter two trust documents. The word "revoked" was not written on the face of any of the declarations of trust. Darling argues the trial court extrapolated from the manner in which the documents were found that the revocation applied to all three documents in

15.

each packet, and suggests that this extrapolation is "quite a stretch." He speculates that, if Flora had intended to revoke the trusts, she would have written a note on the face of each document.

Darling notes there was no direct evidence regarding how the trust declarations became folded together; he suggests Redwine had the motive and opportunity to fold them together herself, especially since the three trusts in issue contained the bulk of the monies in the stock accounts. He asserts the three declarations of trust were trifolded, but were never placed in an envelope and mailed to the mutual fund companies or Flora's investment advisor, supporting "the conclusion that the Notes (if authentic) were nothing more than thoughts Flora Darling may have had at one time about revoking the trust documents."

"An appellate court presumes in favor of the judgment or order all reasonable inferences. [Citation.] If there is substantial evidence to support a finding, an appellate court must uphold that finding even if it would have made a different finding had it presided over the trial. [Citations.] An appellate court does not reweigh the evidence or evaluate the credibility of witnesses, but rather defers to the trier of fact." (*Cahill v. San Diego Gas & Electric Co.* (2011) 194 Cal.App.4th 939, 958.)

At trial, Redwine testified that, after Flora's death, she went to Flora's house and obtained the papers kept in a bedroom that contained two desks, bookcases, a filing cabinet, and boxes and stacks of papers. She packed up most of the papers and took them home to go through. In June or July 2012, she found among the papers three declarations of trust, for the Franklin Templeton trust, the Virtus trust, and the American Funds trust, folded together with writing on the outside. She found a second set of the same trust declarations, again with writing on the outside. There was no dispute the handwriting was Flora's. Redwine testified both handwritten notes included Flora's initials. There was no contradictory evidence.

One handwritten note stated: "Revoked by Flora L. Darling Living Family Trust 1998," followed by Flora's initials. The other read: "Revoked CK Flora L. Darling Living Family Trust 1998," with the initials alongside the word "Living."

Redwine offered in evidence letters and e-mails Flora wrote to her in 1998 and 2011 about Flora's will and trust. In a letter of April 29, 1998,[8] written shortly after Flora executed her will and created her family trust, Flora stated "All of my assets have been place[d] in the trust, excepting what is in the house and my personal cars." She added, "I have divided everything equally among you four. I hate bickering and hard feelings, so I decided that equal division would be the best way to go." Another letter, dated May 27, 1998, stated: "The stocks will go into the trust fund but it will be up to you to invest the monies to the best advantage. So, simply have the stocks turned over to you as executor and take the dividends and distribute the monies to each individual as named in the trust." In a list of her assets prepared in 2011 at Redwine's request, Flora listed: "various stocks—in desk file." Redwine testified Flora did not discuss with her any special provisions for Darling, other than he was to have a particular painting and the guns.

Redwine testified that, shortly before her death, Flora told Redwine the value of the assets in the family trust was $2 million. Her assets had that value only if the value of the stock trusts was included.

Darling presented the testimony of McDonald, who stated Flora told him twice that everything she owned was going into the trust; everything would be sold and split four ways, except some money that was left to Darling by his father. Darling also presented the testimony of Craig Henderson, who was Flora's stockbroker from 1995 to 2004; Henderson testified he reviewed the stock accounts with Flora in 2000 and she said

---

[8] The beginning of the letter is dated May 29, 1998, but a postscript states the correct date was April 29, 1998.

the accounts were intended for her son, Darling.  She never expressed an interest in changing the designations on the accounts.

The credibility of the testimony of Redwine, McDonald, and Henderson, as well as the inferences to be drawn from their testimony and other evidence, including the condition in which Redwine found the three declarations of trust (folded together with Flora's handwritten notes on the outside), were matters for the determination of the trial court.  We cannot reweigh the evidence or substitute our own factual determinations for those of the trial court.  Our only determination is whether the trial court's determinations were supported by substantial evidence.  We conclude substantial evidence supports the judgment of the trial court.

### *DISPOSITION*

The judgment is affirmed.  Defendant Redwine is entitled to her costs on appeal.

_____
HILL, P.J.

WE CONCUR:


_____
GOMES, J.


_____
KANE, J.

18.