Filed 9/12/22 P. v. Marler CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | F083274 |
| Plaintiff and Respondent, | (Super. Ct. No. FP004504A) |
| v. | |
| NICOLE L. MARLER, | **OPINION** |
| Defendant and Appellant. | |

### THE COURT[*]

APPEAL from an order of the Superior Court of Kern County. Judith K. Dulcich, Judge.

Michael C. Sampson, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez and William K. Kim, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

[*]    Before Poochigian, Acting P. J., Smith, J. and Meehan, J.

Defendant Nicole L. Marler appeals from an order extending her commitment as a mentally disordered offender (MDO) pursuant to Penal Code sections 2970 and 2972.[1] On appeal, she contends that substantial evidence did not support the findings that (1) her mental disorder was not in remission and (2) she posed a substantial risk of physical harm to others. The People disagree. We affirm.

## PROCEDURAL SUMMARY

On November 8, 1996, defendant pled no contest to manslaughter (§ 192, subd. (a)) and admitted she personally used a firearm in the commission of the offense (§ 12022.5, subd. (a)).

On October 13, 2020, the Kern County District Attorney filed a petition pursuant to sections 2970 and 2972 to extend defendant's commitment as an MDO. The petition alleged that on September 14, 1999, defendant was committed to the State Department of State Hospitals as an MDO pursuant to section 2962 as a special condition of parole. The petition further alleged that defendant "suffer[ed] from a severe mental disorder that [was] not in remission or [could not] be kept in remission if treatment [was] not continued and by reason of mental disorder, she represent[ed] a substantial danger of physical harm to others.

In support of the petition, the People submitted a recommendation, affidavit, and evaluation by the medical director for the State Department of State Hospitals at Patton State Hospital (PSH), opining that defendant had a severe mental disorder that was not in remission and that, by reason of the severe mental disorder, defendant represented a substantial danger of physical harm to others. Also in support of the petition, the People submitted a report by a senior forensic psychologist at PSH, reaching the same conclusions as the medical director and explaining the basis for those conclusions in detail.

---

[1] All further statutory references are to the Penal Code.

2.

On September 2, 2021, following a bench trial, the trial court granted the petition and extended defendant's commitment to PSH for one year.

On September 3, 2021, defendant filed a notice of appeal.

## FACTUAL SUMMARY

### A. The People's Case

On September 1, 2021, Dr. Jenna Tomei was a licensed psychologist and an expert in forensic psychology who worked at PSH. Part of her duties at PSH included conducting evaluations of patients (including MDOs) to determine whether their commitments should be extended. Her process involved interviewing the patient; reviewing medical records, including hospital treatment progress notes; and consulting with members of the patient's treatment team. In conducting a commitment extension evaluation, Tomei considered whether the patient has a severe mental disorder, whether the disorder is currently in remission or cannot be kept in remission without treatment, and whether the patient poses a substantial risk of physical harm to others due to the severe mental disorder.

Tomei conducted a commitment extension evaluation of defendant. She interviewed defendant on July 20, 2021, reviewed her medical records, and consulted with her treatment team and medical professionals at PSH. Tomei further reviewed defendant's hospital and legal records and determined that defendant was committed to PSH in 1999 as an MDO. She reviewed hospital records and legal records related to the qualifying offense that led to defendant's commission as an MDO. Defendant had shot her husband in the head. She learned that defendant suffered auditory hallucinations before the offense that led to her commitment. Reviewing records related to a patient's qualifying offense assisted Tomei in understanding how a patient's "severe mental disorder may have affected her behavior at the time of the qualifying offense." Understanding how the "severe mental disorder may have contributed to violence in the

3.

past" helped Tomei "conceptualize how it could contribute to violence in the future and what sort of plan needs to be in place in order to keep [the patient] safe in the future."

In reviewing defendant's medical records, Tomei also discovered that defendant was prescribed a regimen of psychiatric medication. Understanding a patient's medication regimen helped Tomei understand how a patient responded to medications. Learning a patient's history of compliance with medication helped Tomei assess the patient's current status and future risk.

Tomei opined that defendant had a severe mental disorder, specifically, schizoaffective disorder, bipolar type. "Schizoaffective disorder is a combination of having mood episodes, so episodes of … depression or mania, as well as psychotic symptoms, so hallucinations or delusions." Psychotic symptoms such as hearing voices or harboring false beliefs impair a person's perception of reality. A person suffering such symptoms may not have sound judgment because they make decisions based on perceptions not rooted in reality. The mood episodes and psychotic symptoms can occur independent of each other. Tomei reached this diagnostic conclusion by interviewing defendant to ask about current and prior symptoms, and reviewing defendant's medical records to determine the symptoms previously observed by other providers and diagnoses made by other providers. Review of a patient's prior symptoms and history of medication was important to Tomei because a medicated patient may present differently because of the medication.

In interviewing defendant on July 20, 2021, Tomei learned that defendant reported that she continued to suffer auditory hallucinations. Tomei's review of defendant's medical records showed her that defendant reported previously having suffered auditory hallucinations and reported that her auditory hallucinations caused her distress and had contributed to her offense. Based on defendant's reports of auditory hallucinations to Tomei and Tomei's review of defendant's records, she opined that those hallucinations impaired her perception of reality. For instance, defendant described that at the time of

4.

her offense "she believed that she was possessed by Satan and that she was hearing voices telling her to obtain a weapon, and she was very concerned about these voices, and it impaired her ability to understand what was real versus not real." Defendant also recently reported to Tomei "that she had experienced an idea of reference, which is a false belief that some sort of innocuous stimuli was directed towards her. Specifically, she reported hearing a preacher on TV and believed that the message was" directed toward her. While defendant was presently able to manage her symptoms better than she had at the time of the offense, "she still ha[d] to engage in a reality testing where she has to look at whether or not they are real versus not real."

Tomei next opined that defendant's severe mental disorder was not in remission. Tomei explained that defendant reported "continued auditory hallucinations, a recent idea of reference, and her medical records suggest[ed] some continued anxiety and possibly depressive symptoms." Specifically, defendant described "voices that were perverted in nature" and told "her to masturbate." She mentioned that they were "related to religion, and she believe[d] the voices were evil." Tomei noted that at the time of defendant's offense, she was also hearing voices "related to demons and devils." Tomei also noted that defendant's medical records in the past year reflected that she continued to hear voices and continued to suffer from anxiety and depression. Because defendant reported continuing to experience active psychotic and mood symptoms, although less frequently, she was not in remission.

Tomei also opined that even if defendant could be considered in remission, she could not be kept in remission without continued treatment because she had not been following her treatment plan as would a reasonable person. The treatment given in PSH was more intensive than would be typically available in the community. Tomei testified that in the past year, even in the PSH setting, defendant required staff support and administration of medication on an as-needed basis to manage her symptoms. Defendant also had not "enrolled in a lot of core treatment programming, and … still continue[d] to

5.

display some impaired insight to her symptoms and how her symptoms are affected by her medical condition." However, at least part of defendant's failure to participate in treatment groups was because she received dialysis treatments for her kidney failure four times per week. She attended some individual treatment sessions to make up for treatment programming missed due to dialysis treatments. Tomei further noted that defendant's primary psychologist also opined, based on defendant's statements to her during treatment, that she is not ready for discharge.

Finally, Tomei testified that defendant represented a substantial danger of physical harm to others by reason of her severe mental disorder. In forming that opinion, she relied upon the "Historical Clinical Risk Management-20, Version 3" assessment tool (historical clinical risk management tool) that looks at risk factors for future violence. The risk factors are sorted into categories: historical risk factors; clinical risk factors, based on current risk factors and current presentation; and risk management factors or factors that give rise to problems in the future.

Tomei explained that the historical risk factors are relevant to predicting future risk of violence because they provide a baseline level of risk based on things that are unchangeable and not amenable to treatment. Defendant's historical risk factors included "a history [of] violence, traumatic experiences, violent attitudes, poor treatment and supervision compliance, substance abuse," and her medical conditions insofar as they were tied to her psychiatric stability. The onset of defendant's medical condition, kidney failure, appeared to correlate with an increase in psychiatric symptoms based on defendant's report and her medical records. Historically, when defendant experienced psychiatric symptoms, she engaged in violence. Defendant's history of violence when experiencing psychiatric symptoms demonstrated difficulty in controlling her conduct when she experienced psychiatric symptoms. Defendant reported that when she heard voices prior to her offense, the voices told her to obtain a weapon and shoot her husband. In that prior experience, defendant reported that she felt as though "she was

6.

possessed …." Defendant also reported having suffered trauma which was tied to her violent behavior. Further, while she was incarcerated and was not taking medications, defendant "decompensated" and engaged in "aggressive and erratic behavior …." Although defendant had a history of medication and treatment noncompliance, she was presently in compliance with her medication. While committed to PSH, defendant had several instances of "physical and verbal aggression" that were relevant to Tomei's assessment. Those aggressive incidents supported Tomei's conclusion that defendant would be violent when decompensated and experiencing active symptoms.

The second consideration, the clinical factors based on defendant's current presentation, include the dynamic or changeable factors that are impacted by treatment. Defendant exhibited such factors, including that "she continued to report problems with a major mental disorder[,] … continued to present with affective instability, some anxiety, some fatigue[,] … [and] poor insight into her mental health condition and how her medical condition impacted her psychiatric stability …." Tomei explained that those factors are related to future violence. Defendant's risk of violence "remains elevated because she still presents with some current problems."

Third, Tomei considered risk management factors—"plans for the future and how that could manage any of the historical or clinical risk factors …." Specifically, she looked for adequate plans to manage and monitor symptoms appropriately and whether enough support or structure is available to help the patient function safely. As a threshold matter, Tomei was concerned with defendant being released to any less structured environment because she presently had support from staff in monitoring her mental illness and medical condition and would likely have difficulty managing both on her own. When Tomei discussed the prospect of functioning in the community with defendant, defendant "was very concerned because she was still hearing voices[, suggesting] that she was not ready to be discharged." In reviewing defendant's discharge plan with defendant, Tomei concluded that the plan was "underdeveloped." If released to the

7.

community to live with her mother, defendant had no plan for how she would manage her psychiatric and medical conditions.

Defendant was released on a conditional release program from 2001 to January 2015, when she voluntarily requested to return to PSH. Tomei reviewed defendant's records from that period and found no reports that would indicate defendant engaged in any violence other than notations of some verbal aggression toward her second husband. Defendant appeared to be medication compliant during that time but returned to PSH because of an increase in symptoms. That defendant elected to return to PSH showed Tomei that she had some level of insight into her symptoms. Defendant was released on conditional release in August 2015 until October 5, 2015, when she was readmitted due to symptoms of psychosis and verbal abuse of her second husband. Since readmission on October 5, 2015, defendant consistently reported auditory hallucinations and some delusional ideation.

Dr. Ryan Jordan was a licensed clinical psychologist at PSH and an expert in forensic psychology. He described the same three criteria as did Tomei regarding extensions of MDO commitments pursuant to section 2970—whether a patient has a severe mental disorder, whether it is in remission or can be kept in remission without treatment, and whether the patient poses a substantial danger of physical harm to others by reason of the severe mental disorder. He conducted an evaluation of defendant based on those criteria to determine whether her commitment should be extended. The final version of his report was submitted in August 2020, and he conducted a follow-up interview of defendant in August 2021.

Jordan concluded defendant suffered from a severe mental disorder, specifically, schizoaffective disorder, bipolar type. His diagnosis was based on defendant's records from PSH, her conditional release records, probation reports, the original MDO evaluation created prior to her original commitment, and past interviews of defendant. He did not interview defendant when he prepared his original report because her unit was

quarantined for an extended period as a result of the COVID-19 pandemic. However, he did interview her in August 2021. He described defendant's symptoms as including psychotic symptoms and bipolar traits with both manic and depressive episodes. "Specifically, she has a documented history of paranoid and persecutory delusions involving religious and sexual themes as well as auditory hallucinations, including command auditory hallucinations, rapid speech, racing thoughts, severe irritability, mood irritability, subjective depressed moods, [and] abolition, meaning lack of drive, all of which would be consistent with [her] diagnosis." Defendant's mood and psychotic symptoms presented separately from each other. She has presented with those symptoms "for many, many years and in different settings …." Her symptoms substantially impaired her thinking, her perceptions of reality, and her behavior. They led to her qualifying offense and her 2015 revocation of conditional release.

Jordan opined that as of his August 2020 report, defendant's severe mental disorder was not in remission. He based that opinion on his review of her psychiatric notes, psychology notes, social worker notes, therapy notes, nursing notes, her most recent conditional release evaluation report, and interdisciplinary notes. Those notes all supported the ongoing presence of auditory hallucinations,[2] command auditory hallucinations, noted irritability, depressed mood, and some abolition. Jordan acknowledged that defendant's depressed mood and fatigue could be due in part to her dialysis treatments. While her symptoms had improved with medication, they were not controlled. Further, defendant's enrollment in treatment programs was low (71% participation, rather than the goal of 90% participation), in part due to the medical treatment required by her medical condition and the restrictions on groups offered during the COVID-19 pandemic. Nevertheless, Jordan opined that defendant should participate

---

[2]    Jordan noted that at the time of his August 2021 interview of defendant, she denied auditory hallucinations.

9.

in core clinical treatment groups, including a relapse prevention group and a cognitive behavioral or dialectical behavioral group. While her nonparticipation was not necessarily her fault, it left her without the beneficial treatment she required. He opined that her overall engagement with treatment had been unsatisfactory, and she had not followed her treatment plan as would a reasonable person even in light of her medical needs, to wit, dialysis.

Finally, Jordan opined that were defendant "directly released to the community without supervision, she would remain a substantial danger of physical harm to others by reason of her severe mental disorder." His opinion was based on defendant's documented history of violent behavior associated with her symptoms, her ongoing symptoms (although significantly improved), her history of supervision failure in the community and decompensation even when she remained medication complaint, her history of treatment noncompliance, and her inconsistent (although improved) insight into her symptoms. Jordan also noted that defendant's conduct and mental state at the time of her commitment offense demonstrated she has the capacity for very severe violence in relation to her more serious symptoms. "One of the strongest predictors for future violence is the history of violence." Jordan also noted that defendant had psychiatrically decompensated the last time she was on conditional release and her release was revoked even though she was medication complaint. In 2016, while committed to PSH, she displayed physical and verbal aggression. Those incidents of aggression were significant to Jordan because it showed that even with structural support and medication compliance, defendant remained psychiatrically unstable, and her symptoms led to physical violence in the past. Jordan's conclusion that defendant remained dangerous considered the period from 2016 to the date of his testimony where defendant exhibited no verbal or physical aggression. Although her conduct had improved, it had only done so in a controlled setting with behavioral support.

10.

In forming his opinion regarding defendant's risk of violence, Jordan used the historical clinical risk management tool. He identified eight out of 10 historical risk factors as present for defendant: "her history of violence, her delusional instability, unemployment history, substance use, her diagnosis of a severe chronic mental illness, documented identified traumatic experiences in her history, violent attitude and beliefs associated with her more serious psychotic traits, [and] … the history of noncompliance and supervision failure in the community." He also identified as present the following clinical risk factors: "ongoing symptoms …, inconsistent insight, … mood treatment engagement[,] … low group enrollment, [and] the low group attendance rate." Finally, Jordan found four of five risk management factors present in defendant if she were to be released directly into the community with no supervision or support: "her risk for not utilizing professional services in the community, her lack of a stable living situation, her potential for treatment compliance and substance relapse, and the severe stress she would certainly experience if discharged in this matter." Jordan also noted that defendant appeared to have family support in that her mother is actively involved with her and would provide support in the community.

**B. Defendant's Case**

Defendant testified that she recalled her offense of commitment. In 1993, she shot her husband in the head. At the time she had a mental disorder, schizoaffective disorder. She agreed that she presently had schizoaffective disorder, bipolar type. She believed that mental illness played a role in her killing her husband. At the time, she was homeless, received no treatment, was unmedicated, and heard voices. As a result of those auditory hallucinations, she shot her husband.

After her offense, defendant received treatment for her mental disorder and learned about her diagnosis. She understood that schizoaffective disorder, bipolar type involves a mood component, including anxiety, depression, and lack of drive, and a thought component, including auditory hallucinations.

11.

Defendant spent several years in prison and at the state hospital as a result of her offense. She was transferred from prison to the state hospital because she was suicidal in prison and was hearing voices. While she was committed to the state hospital, she learned about her medications. She recognized the importance of taking her medications. In 2001, she was released on a conditional release. While on conditional release, she learned about the resources available to her in the community including psychiatrists, psychologists, and therapists. She spoke to a psychologist and a therapist weekly for approximately 15 years when she was on conditional release. She also received mental health assistance through Kern County Mental Health services. She took classes at the YMCA and volunteered at a museum, and transported herself there with public transportation.

In 2015, defendant asked to return to PSH because she was experiencing symptoms: her eating habits changed, her sleeping habits changed, she heard voices, and she started being verbally aggressive toward her husband and family. At that time, defendant understood that she was being considered for release from conditional release into the community. When defendant returned to PSH, she learned that she had kidney failure. She began dialysis three times per week at four hours per sitting. Eventually her dialysis was increased to four times per week. The process was very disturbing for her because she had to wake up at 5:00 a.m. to travel outside PSH so she could sit with a needle in each arm for four hours. She felt "very drained, very tired, and sometimes … irritable" after each treatment. Recently, when defendant returned to PSH after dialysis treatments, she engaged in available mental health treatment. When pandemic-related quarantine measures no longer restricted her activity, she attended a mental health group once per week, regularly attended alcoholics anonymous meetings, and attended most of the arts and crafts groups.

Defendant listed her medications, the purpose of some medications, and her schedule for taking her medications. She acknowledged that at PSH her medications

12.

were brought to her every day and provided her treatment. The medications kept her "balanced" and helped prevent auditory hallucinations. Defendant testified both that she currently did not experience auditory hallucinations and that she did currently experience auditory hallucinations, but they were less severe than in the past and currently sounded like "background noise" or "static." She told Tomei that she heard voices approximately two months before her testimony, but the voices did not tell her to do things. She also testified that she had learned to manage her auditory hallucinations through coping mechanisms like drawing, listening to the radio, exercising, and going to groups.

Defendant described her plan upon release from commitment. She would continue her education, continue taking her medication, continue her dialysis treatments, continue "to be involved with mental health if that is what is asked of [her], … and maybe get a part-time job." She also testified that she would "definitely" seek out a psychologist, a therapist, and a psychiatrist if she was released. She would live with her 78-year-old mother. Her mother said that she would help defendant go to dialysis, attend mental health appointments, and seek social security assistance. Her mother had a room prepared for her. Defendant testified that she was ready to be released from PSH. When she told Tomei that she was not ready to be released from the hospital, she meant that she needed a hernia surgery and a surgery on her arm before she wanted to be released. She also told Jordan that she needed a few more months in PSH "a little less than a month" before her trial testimony. Defendant has not heard voices directing her to hurt people since 1993. If she heard voices or thought her behavior was changing, she would tell her mother and then call the police.

Defendant apologized for her crime of commitment. She testified she had learned a lot since then, including things about herself, things about "being in relationships," how to avoid being around "the wrong people," and how to avoid doing "the wrong things." She testified that she had changed, and she wanted to do what was right. She was

worried that staying at PSH might worsen her symptoms because she found PSH to be stressful.

## DISCUSSION

Defendant argues two of the findings required for the recommitment order—that defendant was not in remission or could not be kept in remission without treatment and that she posed a substantial danger to society—were not supported by substantial evidence. Specifically, defendant argues that the evidence that she was not in remission was lacking because the record contained no evidence that she "overtly or openly displayed psychotic traits." She argues that the evidence that her severe mental condition could not be kept in remission without treatment was also lacking because no evidence supported the doctors' conclusions that she had not followed her treatment plan. Finally, she argues that proof of her dangerousness was lacking because the record contained no evidence demonstrating that she was *currently* dangerous (rather than that she might be dangerous at some unknown future time) or that she had difficulty controlling her behavior. The People disagree, as do we.

### I. Trial Court's Conclusions

The trial court concluded that defendant suffered from a severe mental disorder. The court explained that whether a defendant's severe mental disorder is in remission turns on whether the "external signs and symptoms of the severe mental disorder are controlled by either psychotropic medication or psychosocial support." It commented that she had self-reported auditory hallucinations and concluded the disorder was not in remission. Finally, as to defendant's current dangerousness, the court recited that the doctors reviewed defendant's entire mental health history, both considered the same tool, and both concluded that the formal structure of PSH was necessary to prevent physical harm to others. In light of defendant's plan to release directly to the community and the doctors' concern about a lack of structure causing her to decompensate, the trial court found that defendant presently represents a substantial danger of physical harm to others.

14.

## II. Relevant Law and Legal Standard

" 'Enacted in 1985, the [Mentally Disordered Offender Act (MDO Act)] requires that an offender who has been convicted of a specified felony related to a severe mental disorder and who continues to pose a danger to society receive appropriate treatment until the disorder can be kept in remission.' [Citation.] The MDO Act provides for treatment at three stages of commitment: as a condition of parole (§ 2962), in conjunction with the extension of parole (§ 2966, subd. (c)), and following release from parole (§§ 2970, 2972). [Citation.] [¶] … [¶] Sections 2970 and 2972 govern the third and final phase of MDO commitment, which begins once the offender's parole term has expired. Section 2970 permits a district attorney, on the recommendation of medical professionals, to petition to recommit an offender as an MDO for an additional one-year term. An offender will be recommitted if 'the court or jury finds [1] that the patient has a severe mental disorder, [2] that the patient's severe mental disorder is not in remission or cannot be kept in remission without treatment, and [3] that by reason of his or her severe mental disorder, the patient represents a substantial danger of physical harm to others.' (§ 2972, subd. (c).)" (*People v. Foster* (2019) 7 Cal.5th 1202, 1207–1208.) At a recommitment hearing, the issue is whether the defendant's "current condition justifie[s] extension of his [or her] commitment." (*People v. Cobb* (2010) 48 Cal.4th 243, 252.)

"The term 'remission' means a finding that the overt signs and symptoms of the severe mental health disorder are controlled either by psychotropic medication or psychosocial support. A person 'cannot be kept in remission without treatment' if during the year prior to the question being before … a trial court, the person has been in remission and has been physically violent, except in self-defense, or … has not voluntarily followed the treatment plan. In determining if a person has voluntarily followed the treatment plan, the standard is whether the person has acted as a reasonable person would in following the treatment plan." (§ 2962, subd. (a)(3).)

While " ' "substantial danger of physical harm" does not require proof of a recent overt act' " for purposes of recommitment as an MDO (*In re Qawi* (2004) 32 Cal.4th 1, 24 (*Qawi*), quoting § 2962, subd. (f)), that does not negate the statutory requirement of proof beyond a reasonable doubt that the person currently poses a substantial danger of physical harm to others, before recommitment as an MDO is permitted. (See § 2972, subds. (a)(2), (c), (e).)

Review for sufficiency of the evidence in the MDO recommitment context uses the same standard applied in the criminal conviction context—the substantial evidence rule. (*People v. Labelle* (2010) 190 Cal.App.4th 149, 151.) "In considering the sufficiency of the evidence to support MDO findings, an appellate court must determine whether, on the whole record, a rational trier of fact could have found that [a] defendant is an MDO beyond a reasonable doubt, considering all the evidence in the light which is most favorable to the People, and drawing all inferences the trier could reasonably have made to support the finding." (*People v. Clark* (2000) 82 Cal.App.4th 1072, 1082.)

A single opinion by a psychiatric expert that a person is currently dangerous due to a severe mental disorder can constitute substantial evidence to support the extension of an MDO commitment. (See *People v. Bowers* (2006) 145 Cal.App.4th 870, 879; *People v. Zapisek* (2007) 147 Cal.App.4th 1151, 1165.) An expert's testimony in civil commitment cases on a person's dangerousness or likely dangerousness may be the only evidence available on the issue. (*People v. Ward* (1999) 71 Cal.App.4th 368, 374.) However, "[e]xpert opinion testimony constitutes substantial evidence only if based on conclusions or assumptions supported by evidence in the record. Opinion testimony which is conjectural or speculative 'cannot rise to the dignity of substantial evidence.' " (*Roddenberry v. Roddenberry* (1996) 44 Cal.App.4th 634, 651.)

### III. Severe Mental Disorder Not in Remission or Could Not Be Kept in Remission Without Treatment

Defendant contends that the evidence did not support the conclusion that she displayed "*overt signs and symptoms*" of her severe mental disorder as required by section 2962, subdivision (a)(3). She argues that because both experts testified that she self-reported experiencing auditory hallucinations and those symptoms were not overtly observed, the record did not support any finding of overt signs and symptoms. She further cites to the notes by her social worker, psychologist, doctor, and nurse between March 16, 2020, and August 9, 2021, that she did not appear to exhibit any external psychotic symptoms.

The People argue that an "overt" sign of severe mental disorder need not be observable. Instead, they argue, a symptom is overt if it is "clear, plain, and unmistakable." Under that reasoning, they argue that defendant's auditory hallucinations were overt. To that end, the People note that defendant reported experiencing auditory hallucinations and Tomei commented that defendant reported an " 'idea of reference' " regarding a television preacher speaking directly to her. They rely on Tomei's description of her symptoms as " 'active symptom[s] of psychosis.' "

Even assuming a symptom must be observable, the People argue that Tomei's testimony that defendant's auditory hallucinations "still distract her, and [that] she still has to engage in a reality testing where she has to look at whether or not [the hallucinations] are real versus not real" shows that defendant had observable symptoms of her severe mental disorder. Further, the People direct us to Jordan's testimony that defendant "present[ed] with irritability" and "evidenc[ed] abolition," which are symptoms of psychosis, and defendant having presented with depressed mood and "notable stress" as a result of her auditory hallucinations.

The People cite to no authority, and we have discovered none, in support of their contention that an unobservable *symptom* can be "overt" within the meaning of

17.

section 2962, subdivision (a)(3). As defendant correctly notes, the definition of "overt" includes an element of "open[ness] and observab[ility]." (Black's Law Dict. (11th ed. 2019), overt.) While it is our view that defendant's self-reporting of auditory hallucinations constituted an overt *sign* that she was in fact suffering auditory hallucinations—i.e., an open sign that defendant suffered a covert symptom—sufficient for the trial court to have concluded that her severe mental disorder was not in remission, we need not rely only on that conclusion. The record contains other evidence that supports the trial court's finding that defendant's severe mental disorder was not in remission: Tomei testified defendant's auditory hallucinations "distracted" her, which Jordan characterized as an observable feature of a hallucination; defendant told Tomei that a television preacher sent a message directly to her through the television, which was an expressed and "active symptom of psychosis"; and she presented with a depressed mood and irritability, both of which Jordan characterized as "primary external symptoms" and "consistent with her diagnosis." Those observable symptoms were overt signs or symptoms of a severe mental disorder that were not controlled by medication or psychosocial treatment.

Sufficient evidence supported the trial court's conclusion that defendant's severe mental disorder was not in remission.[3]

### IV. Substantial Danger of Physical Harm to Others

Defendant contends that the evidence was insufficient to prove that she " '*currently* poses a substantial danger of physical harm to others.' " She contends the

---

[3] Because we conclude that sufficient evidence supported the trial court's conclusion that defendant was not in remission, we do not reach whether the record contained sufficient evidence to support a finding that defendant's severe mental disorder could not be kept in remission without treatment. However, we note that the record contains testimony by Jordan and Tomei that defendant had not followed her treatment plan as would a reasonable person, even considering the limitations posed by her physical illness.

doctors' opinions were that she might, at some future time, become dangerous if released. Those opinions, she argues, were too speculative and did not address her present danger. The People disagree, as do we.

A substantial danger of physical harm to others means "a prediction of future dangerousness by mental health professionals." (*Qawi*, *supra*, 32 Cal.4th at p. 24.) "A single psychiatric opinion that a person is dangerous because of a mental disorder constitutes substantial evidence to justify the extension of the commitment." (*People v. Williams* (2015) 242 Cal.App.4th 861, 872; *People v. Mapp* (1983) 150 Cal.App.3d 346, 352 [when supported by the record, "predictions of future dangerousness may be rationally projected and the drawing of such an inference is properly within the expertise of a qualified mental health expert"].) However, an expert's opinion carries weight only if it is factually supported by evidence in the record. (*Roddenberry v. Roddenberry*, *supra*, 44 Cal.App.4th at p. 651.)

Here, Tomei and Jordan both testified that defendant presently represented a substantial danger of physical harm to others by reason of her severe mental disorder. Both utilized the historical clinical risk management tool as an aide for the exercise of their professional judgment to determine that defendant was presently dangerous. Tomei testified she interviewed defendant on July 20, 2021, reviewed her medical, legal, and PSH records, and consulted with her treatment team and medical professionals at PSH. Jordan reviewed the same records and consulted with defendant's treatment team but did not interview defendant prior to his assessment. Both doctors concluded that defendant presented with historical, clinical, and risk management factors that caused her to present a substantial danger of physical harm to others if not confined to a hospital. To name a few of the factors the doctors considered, defendant had been physically violent and verbally aggressive in the past as a result of auditory hallucinations which have impaired her perceptions of reality and behavior, she presently suffered from auditory hallucinations and some delusional ideation, she had a history of poor treatment

19.

compliance, she had a history of decompensation even when involved in treatment and medication compliant, she was aggressive when on conditional release, she had a history of substance abuse, she demonstrated inconsistent insight into her disorder and need for treatment, her plan for functioning in the community was underdeveloped, and she posed a risk of treatment and medication noncompliance if released. Based on that evidence and the doctors' testimony regarding defendant's risk of violence, sufficient evidence exists in the record to support the trial court's conclusion that defendant represented a substantial danger of physical harm to others as a result of her severe mental disorder. That defendant did not commit an overt dangerous act while institutionalized in the past year and that the doctors could not predict with certainty when defendant would psychiatrically decompensate and commit an act of violence does not undermine that conclusion. (*Qawi*, *supra*, 32 Cal.4th at p. 24; see *People v. Sumahit* (2005) 128 Cal.App.4th 347, 353.)[4]

We find no error.

## DISPOSITION

The order is affirmed.

---

[4] Defendant also briefly claims that there was no evidence supporting the required finding that defendant had "serious difficulty in controlling [her dangerous] behavior" as required. (*Kansas v. Crane* (2002) 534 U.S. 407, 413.) We disagree. Jordan and Tomei both testified that defendant's severe mental disorder impaired her perception of reality, her judgment, and her behavior. That impairment directly contributed to her offense of commitment and revocation of conditional release. That evidence was sufficient to support a finding that defendant had serious difficulty in controlling her dangerous behavior as a result of her severe mental disorder.